S.E. TURNER and Margaret Turner, shareholders of Mid Valley Bank; Mid Valley Bank, derivatively through S.E. Turner and Margaret Turner; and the class of Mid Valley Bank shareholders, Plaintiffs,

v.

The OFFICERS, DIRECTORS AND EMPLOYEES OF the MID VALLEY BANK including the Following Paul E. Farris and Jane Doe Farris, husband and wife; Monte Rusk and Jane Doe Rusk, husband and wife; Clayton Emry and Jane Doe Emry, husband and wife; Unnamed Non–Dissenting Directors; the State of Washington, State Bank Supervisor, John Oldfield, the agent of the State of Washington; and First Bank Washington, a national banking association, Defendants.

FEDERAL DEPOSIT INSURANCE CORPORATION, in its corporate capacity, Intervenor/Plaintiff,

v.

S.E. TURNER and Margaret Turner, husband and wife, Defendants.

No. C 87–706–JLQ.

United States District Court, E.D. Washington.

Aug. 24, 1988.

Eric K. Nayes, Spokane, Wash., for plaintiffs.

James D. Perkins, Spokane, Wash., for intervenor FDIC.

Geoffrey P. Knudsen, Seattle, Wash., for Paul F. and Claudia Farris.

Richard B. Price, Omak, Wash., for Monte and Betty Rusk and Clayton and Joyce Emry.

Christine M. Moore, Seattle, Wash., for First Bank Washington.

Donald F. Cofer, Asst. Atty. Gen., Olympia, Wash., for State of Wash., and State Bank Supervisor.

QUACKENBUSH, District Judge.

BEFORE THE COURT are motions by the plaintiffs to amend their complaint, and motions by all defendants seeking summary judgment and dismissal. Hearing in the above entitled matter was held July 16, 1988. Rodney M. Reinbold and Eric Nayes appeared for plaintiffs; James D. Perkins and Thomas S. Rees appeared for intervenor Federal Deposit Insurance Corp.; Christine Moore appeared for defendant Firstbank of Washington; Assistant Attorney General Donald Cofer appeared for defendant Washington State and State Banking Supervisor Oldfield; Geoffrey P. Knudsen appeared for defendant Farris; defendants Rusk and Emry did not appear. Having reviewed the record, heard argument of counsel, and being fully advised in the premises, it is HEREBY ORDERED THAT:

1. Plaintiffs' motion to amend their complaint is HEREBY GRANTED.

2. Defendants' motions to dismiss and for summary judgment ARE HEREBY GRANTED.

## BACKGROUND

The plaintiffs, S.E. Turner and Margaret Turner are stockholders in Mid Valley Bank. In September, 1985, the State Banking Supervisor, Thomas Oldfield, began reviewing Mid Valley Bank (MVB) due to problems with its loan portfolio. On September 25, 1985 the Supervisor, having found that MVB was in an "unsafe condition", directed MVB to make certain changes. (Ct.Rec. 15, Exh. A) Losses continued. In February, 1986, MVB hired Butterfield to conduct an internal examination and to take over credit management. Butterfield completed his examination in March, 1986, at which time he estimated that MVB had a negative net worth (Ct. Rec. 43). The Supervisor and FDIC then verified his findings, calculating the criticized assets at $12.5 million and the net worth at minus $3.2 million.

In June, 1986, following the resignation of the president of MVB, Butterfield was appointed acting president. MVB was unable to comply with the Supervisor's directive. On Friday, August 29, 1986, the Supervisor of Banking ordered that MVB be placed in the possession of the Supervisor. In his Findings of Fact and Conclusions of Law (Exhibit A, Ct.Rec. 15) the Supervisor determined that the bank would be unable to meet its obligations as they became due, and was in danger of failing or closing, and that therefore, the bank's insolvency made it necessary for the Supervisor to take possession of the bank, without notice, pursuant to RCW 30.44.020, in order to protect the interest of the public, the depositors, and creditors.

During the months preceding the Supervisor's August 29th take-over, MVB had been involved in litigation with Central Valley Bank over certain loans which MVB had made and CVB had taken over under a participation agreement. CVB had recovered a judgment against MVB on one of the suits and allegedly settled the other, for a total of $2.4 million. Just before the

take-over MVB settled both suits for a payment of $870,000, with MVB agreeing to re-assume some of the loans. Plaintiffs challenge this payment as an illegal preference which resulted in MVB's insolvency and ultimate take-over.

For several months preceding take-over, the Supervisor had been attempting to find a bank interested in taking over MVB's operations in Omak. In his findings approving the acquisition by First Bank, the Supervisor of Banking determined that no state bank, trust company, or national banking association already doing business in Washington, or domestic bank holding company, was interested in acquiring MVB on terms at least as favorable as those offered by First Bank Systems (FBS), and that the failure or closure of MVB would have a substantial economic impact on the Okanogan trade area (Ct.Rec. 15, attachment 3). Therefore, immediately after taking possession, he entered into a Purchase and Assumption Agreement (P & A Agreement) with First Bank Washington (FBW) and First Bank Systems (FBS), its out-of-state holding company (Ct.Rec. 25, Exhibit C). Under this agreement, FBW agreed to purchase all of the assets of MVB, except for several specifically excluded assets. In a contemporaneous Assistance Agreement (Ct.Rec. 15, attachment 2), Federal Deposit Insurance Co. (FDIC) agreed to purchase the riskiest loans, including the Colbert, Johnson and Tonoro Growers (Ellis & Martin Orchards) loans, from FBW or to indemnify against certain losses from litigation or loan participation, for $3,500,000.[1] Under this agreement First Bank agreed to convey to FDIC all of First Bank's right, title and interest in any cause of action or claim against any person or entities, or any insurance policy, for recovery of such losses to the extent that FDIC incurred losses on the assets transferred by First Bank to FDIC.

The Supervisor then petitioned the Superior Court of Okanogan County for approval of the P & A Agreement (Ct.Rec. 15, Exhibit B) and the Assistance Agreement, and an order approving the sale was entered by the court on Saturday, August 30, 1986, in Cause No. 86–2–00308–0 (Ct.Rec. 15, Exhibit D). The former MVB opened the following Monday morning under the name First Bank Washington.

Plaintiffs do not challenge the propriety or necessity of the take-over by the Banking Supervisor. They do, however, challenge the sale of MVB's assets to FBS without notice to the shareholders, on the basis that the lack of notice was a violation of their constitutional right to due process, and that the Supervisor failed to comply with the statutory requirement that an inventory of bank assets be submitted to the court. They assert that even if the sale of the assets is upheld, the P & A Agreement does not include the bank's right to sue its officers and directors for mismanagement of the bank's affairs. They wish to have the sale set aside, the alleged preference to Central Valley Bank returned to the MVB estate, and the Supervisor directed to attempt to recover from the MVB's insurance policies covering officer and director mismanagement liability. It seems to be their belief that if all of these steps occurred, there would be assets remaining in the bank estate, after payment of all creditors, for return to the shareholders.

Initially the plaintiffs, as putative representatives of a shareholder class, sought to personally pursue their claims against the officers and directors, and to pursue the potential for recovery under the bank's insurance policies. Due to the weight of authority[2] that a shareholder derivative

---

1. The result of the Assistance Agreement was that it would cost FDIC $3.5 million to avoid MVB failing, minus whatever amount they could recover on the assets they purchased from FBW. The alternative was to allow the bank to fail, in which case FDIC would have to pay depositors the amount of their deposits, up to $100,000, after liquidating assets. Coupled with a likely run on the bank, hardship to the community, and loss of confidence in banks was the

likelihood that forced liquidation would result in an even lower recovery on the "assets", with comparably higher losses to FDIC.

2. *See, e.g., Hanson v. Am. Bonding Co.,* 183 Wash. 390, 48 P.2d 653 (1935); *Fidelity & Deposit Co. of Maryland v. Opportunity State Bank,* 174 Wash. 245, 24 P.2d 399 (1933); *F.D.I.C. v. Am. Bank Trust Shares, Inc.,* 412 F.Supp. 302, 306, *remanded on other grounds,* 558 F.2d 711

suit is owned by the Supervisor of Banking following his taking over all bank property, the plaintiffs have withdrawn their derivative suit and have withdrawn their motion for class certification. They have asked the court for permission to amend their complaint to strike any references to class representation. (Ct.Rec. 53) Plaintiffs now take the position that they stand in the position of beneficiaries of a trust of which the Bank Supervisor is trustee.[3] They are asking the court to add a paragraph to the complaint praying for the court to declare that (1) the mismanagement claim, secured by $3.5 million of errors and omissions insurance and a $1 million bond, remains an asset of the bank's estate; (2) that the preference of $900,000 given in the form of a suit settlement to the Central Valley Bank must be returned to the bank's estate; (3) that the claim against the Bank Supervisor, for illegally licensing First Bank Washington, is an asset of the bank's estate, and (4) that all other assets not explicitly enumerated or inventoried in writing remain assets of the estate of the Bank Supervisor. (Ct.Rec. 52)

## ANALYSIS

Whether the Supervisor can be forced to pursue such claims by shareholders if they are found to remain in the estate is not properly before this court at this time. The Supervisor of Banking has broad discretionary authority under RCW 30.44.050.[4]

(4th Cir.1977) (causes of action for losses sustained because of the mismanagement and negligence of directors, officers and employees of a bank belong to the bank itself, and not to the stockholders, and in liquidation become vested in the receiver, who may sell them like any other asset); but *contra, Landy v. F.D.I.C.,* 486 F.2d 139, 148 (3rd Cir.1973) (when a receiver refuses to bring a shareholder derivative suit, the stockholders are free to sue).

3. This argument has some merit, since if the bank estate has any assets remaining after disbursement to prior priority claimants, then the shareholders have a right to the surplus, *In re Puget Sound Savings & Loan Assn.,* 49 F.2d 922 (W.D.Wash.1931). The purpose of the act "was as far as possible to provide for the satisfaction of all claims of depositors and creditors and to save as much as possible for ultimate return to the stockholders." *State ex rel. Coulee State Bank v. Farnsworth,* 125 Wash. 264, 266, 215 P. 355 (1923). However, in light of this court's

*See In re Liquidation of Cashmere State Bank,* 169 Wash. 258, 13 P.2d 892 (1932). Prior to a determination that the mismanagement claims remain an asset of the bank's estate, and the occurrence of sufficient events to support a claim that the supervisor has abused his discretion by not bringing such a suit, there fails to be a case or controversy conferring jurisdiction on this court.

Washington's banking statutes are, like those of most other states, modeled upon the National Bank Act, Title 12, United States Code. In construing these statutes the Supreme Court of Washington has followed the decisions of the United States Supreme Court in its construction of the National Bank Act. *Jenks v. State of Washington,* 188 Wash. 472, 63 P.2d 369 (1936). Since neither the Ninth Circuit nor Washington courts have decided a number of the issues which are before this court, this court finds persuasive the decisions of other circuits cited herein.

## SUMMARY JUDGMENT

■ This matter is before the court on both motions to dismiss and motions for summary judgment. Fed.R.Civ.P. 12(b) permits the court to treat a motion for dismissal under Rule 12(b)(6), for failure to state a claim upon which relief can be granted, as a motion for summary judgment when matters outside the pleading are presented to and are not excluded by

finding that all assets of the estate, with the exception of the specifically excluded assets, were conveyed by the Supervisor to Firstbank, plaintiffs' interest, if any, in such a trust res must necessarily be limited to the assets remaining in the trust estate.

4. RCW 30.44.050 provides in part:
   Upon taking possession of any bank or trust company, the supervisor shall proceed to collect the assets thereof and to preserve, administer and liquidate the business and assets of such corporation. With the approval of the superior court of the county in which such corporation is located, he may sell, compound or compromise bad or doubtful debts, and upon such terms as the court shall direct borrow, mortgage, pledge or sell all or any part of the real estate and personal property of such corporation.
   .   .   .   .   .

the court. Where the court has not expressly excluded the extraneous matters presented in response to the motion, the motion must be disposed of under Fed.R. Civ.P. 56 as a motion for summary judgment. *Erlich v. Glasner*, 374 F.2d 681, 683 (9th Cir.1967). Such affidavits having been submitted and considered by this court, this matter will be disposed of by summary judgment.

The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court. *Zweig v. Hearst Corp.*, 521 F.2d 1129 (9th Cir.1975). Traditional summary judgment analysis establishes that the moving party is entitled to judgment as a matter of law where, viewing the evidence and the inferences arising therefrom in favor of the nonmovant, there are no genuine issues of material fact in dispute. Fed.R.Civ.P. 56(c); *Semegen v. Weidner*, 780 F.2d 727 (9th Cir.1986). However, summary judgment is appropriate only where reasonable minds could not differ on the material facts at issue. *See v. Durang*, 711 F.2d 141 (9th Cir.1983).

In *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), the Supreme Court stated that when the moving party has carried its burden under Rule 56(c) "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586, 106 S.Ct. at 1356. "[I]f the factual context renders respondent's claim implausible ... respondents must come forward with more persuasive evidence to support their claim than would otherwise be necessary." *Id.* at 587, 106 S.Ct. at 1356.

A few months later, in its decisions in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the Supreme Court further clarified the new criteria. In *Anderson* the Court held that in ruling on a motion for summary judgment the judge must view the evidence presented "through the prism of the substantive evidentiary burden," i.e., it must apply the standard of proof pertinent to the type of case before the court in reaching a decision whether summary judgment is proper. *Anderson, supra* at 255, 106 S.Ct. at 2513. *Celotex* attempted to clarify the burden that the parties must meet to succeed in, or withstand a motion for summary judgment.

In evaluating the appropriateness of summary judgment under these recent decisions, three steps are necessary: (1) determination of whether a fact is material; (2) determination of whether there is a genuine issue for the trier of fact, as determined by the documents submitted to the court; and (3) consideration of that evidence in light of the appropriate standard of proof. As to materiality, the applicable substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude entry of summary judgment. Factual disputes which are irrelevant or unnecessary to the outcome are not counted. *Anderson, supra* 477 U.S. at 248, 106 S.Ct. at 2510. Where there is a complete failure of proof concerning an essential element of the nonmoving party's case, all other facts are rendered immaterial, and the moving party is entitled to judgment as a matter of law. *Celotex, supra* 477 U.S. at 323, 106 S.Ct. at 2553.

The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of any genuine issue of material fact. *Celotex, supra* at 323, 106 S.Ct. at 2553.

Where the moving party has met his initial burden with a properly supported motion, the party opposing the motion "may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." *Anderson, supra* 477 U.S. at 248, 106 S.Ct. at 2510.

As will be shown below, defendants have persuasively argued that plaintiffs lack standing to pursue their claims before this court. This is the threshold issue rendering all other questions immaterial for summary judgment purposes. Plaintiffs have not claimed there are disputed factual issues pursuant to Local Rule 13(b).

PLAINTIFFS' STANDING

Plaintiffs seek declaratory relief as shareholders whose investment in Mid Valley Bank was lost due to the sale of all its assets to First Bank. Their situation is somewhat analogous to that of the shareholders in *Lewis v. Chiles*, 719 F.2d 1044 (9th Cir.1983). In *Lewis* the shareholders of Fred Meyer, Inc. approved the sale of the corporation's assets to two companies. The Ninth Circuit held that a pending derivative suit against the officers and directors to recover unauthorized bonuses was an intangible asset of Fred Meyer, Inc., which passed to the acquiring companies with the sale of Fred Meyer's other assets, and that therefore the plaintiff-shareholders lacked standing to sue. Only the acquiring companies and their shareholders had an interest in pursuing the claims. *Id.*, at 1047. Any decrease in the value of the shares which may have been caused by the alleged breaches of fiduciary duty by the corporation's officers would not give rise to a direct cause of action by the shareholders. *Id.*, at 1049.

It is clear here that the claimed damages, if proven, were suffered by the corporation, and only indirectly by the plaintiff. The damage sustained by plaintiff is to the value of his stock in Mid Valley Bank. The mere fact that a stockholder owns stock in a corporation does not, of itself, authorize him to sue as an individual, absent injury to him distinct from devaluation of his stock. *Erlich v. Glasner*, 418 F.2d 226, 228 (9th

Cir.1969), citing 13 Fletcher, *Cyclopedia of the Law of Private Corporations.*

The general rule for distinguishing between claims which a corporate shareholder may bring on his own behalf and those which may only be brought by or on behalf of the corporation is as follows:

> The action is derivative, that is, in the corporate right, if the gravamen of the complaint is *injury to the corporation, or to the whole body of its stock* or property without any severance or distribution among individual holders, *or if it seeks to recover assets for the corporation or to prevent the dissipation of its assets.* As has been well said, 'any other rule would admit of as many suits against the wrongdoer as there were stockholders in the corporation.' If damages to a stockholder result indirectly, as the result of an injury to the corporation, and not directly, he cannot sue as an individual. (Footnotes omitted) (emphasis added)

12B Fletcher, *Cyclopedia of Corporations*, s 5911, p. 421 (perm. ed.).

Washington courts have adopted this majority rule, limiting exceptions to instances in which the stockholder's injury resulted from the violation of some special duty owed to him in circumstances *independent* of the stockholder's status as a stockholder. *Hunter v. Knight, Vale & Gregory*, 18 Wash.App. 640, 646, 571 P.2d 212 (1977) (emphasis in original).

The Ninth Circuit has also addressed the issue of shareholder standing.[5] In each case, where the shareholder asserts that he has been injured economically but is unable to establish injury independent of that done to the corporation, the court has found that he lacks standing.

■ The case before this court is directly within the general rule noted in Fletcher,

**5.** *See, e.g., Sherman v. British Leyland Motors, Inc.*, 601 F.2d 429, 440 (9th Cir.1979) (a sole shareholder lacks standing to assert either federal or state law claims, since his status was that of an incidental beneficiary); *Von Brimer v. Whirlpool Corp.*, 536 F.2d 838, 846 (9th Cir. 1976) (majority shareholder lacks standing where the action involves a decline in the value of his stock, rather than a contract to which he was a party, or a right belonging severally to him, or a fraud affecting him directly); *Shell Petroleum, N.V. v. Graves*, 709 F.2d 593, 595 (9th Cir.), *cert. denied*, 464 U.S. 1012, 104 S.Ct. 537, 78 L.Ed.2d 717 (1983) (to have standing, shareholder must assert more than personal economic injury resulting from a wrong to the corporation).

being an attempt by plaintiffs to recover assets for the bank estate. If the court were to recognize plaintiffs' standing in this instance it would open the door to litigation by each shareholder of Mid Valley Bank. Plaintiffs have recognized that they have no standing to sue derivatively, due to ownership of such suits by the supervisor upon take-over. Under the *Lewis v. Chiles, supra,* pg. 1495, analysis, the only shareholders who can assert the derivative claim are the shareholders of First Bank Washington, the acquiring bank, to the extent such claims were not assigned to FDIC. Since plaintiffs cannot sue derivatively, and are precluded from suing individually in light of the nature of their injury, they lack standing to litigate any of the issues before the court.

Where plaintiffs lack standing to sue, there can be no genuine issue of material fact in dispute, since they can bring no dispute before the court. Therefore, summary judgment of dismissal is appropriate.

MISMANAGEMENT CLAIMS

Plaintiffs concede that the mismanagement claims against the officers and directors of MVB passed to the Supervisor of Banking as property of the bank (Ct.Rec. 22, pg. 11). The question is whether those claims remain assets of the estate or were conveyed to First Bank in the Purchase and Assumption Agreement. It is plaintiff's position that the language of that agreement is ambiguous and should be interpreted by this court as conveying only the insurance protection, not the mismanagement lawsuit.

A careful analysis of Washington law on ambiguity in contracts was made by the court in *Fancher Cattle v. Cascade Packing,* 26 Wash.App. 407, 408–09, 613 P.2d 178 (1980). The determination of whether a written instrument is ambiguous is a question of law for the court, *Ladum v. Utility Cartage, Inc.,* 68 Wash.2d 109, 411 P.2d 868 (1966), as is the interpretation to be given the instrument once ambiguity is found, *In re Estate of Larson,* 71 Wash.2d 349, 428 P.2d 558 (1967). If the terms of the contract taken as a whole are plain and unambiguous, the meaning of the contract is deduced from its language alone, with no need for the court to utilize aids in construction. *Finch v. King Solomon Lodge 60,* 40 Wash.2d 440, 243 P.2d 645 (1952). However, if the court finds that the language of the contract is ambiguous, then the court has the duty to search out the intent of the parties by viewing the contract as a whole and considering all the circumstances surrounding the transaction, including the subject matter and the subsequent acts of the parties. *Burch v. Rice,* 37 Wash.2d 185, 222 P.2d 847 (1950). The primary factor to be considered in determining the meaning of the contract is the intention of the parties to it. *Grand Lodge v. United States Fid. & Guar. Co.,* 2 Wash.2d 561, 569–70, 98 P.2d 971 (1940).

The first question is therefore whether the Purchase and Assumption Agreement is ambiguous. Ambiguous means "capable of being understood in either of two or more possible senses." *Ladum v. Utility Cartage, supra* 68 Wash.App. at 116, 411 P.2d 868. Section 3.1 of the P & A Agreement identifies the assets purchased.[6] Subsection (g) provides for the sale of

---

6. Section 3.1 of the Purchase and Assumption Agreement provides:

*Assets Purchased:* New Bank hereby purchases from the Supervisor and the Supervisor hereby agrees to and does sell, assign, transfer, convey and deliver to New Bank the right, title and interest of the Supervisor in and to the assets set forth below, and more fully described in Schedule B attached to this Agreement, except the assets which are identified in Schedule B as specifically excluded from the assets to be acquired (the "Excluded Assets"):

(a) Cash and receivables from banks and any accrued interest thereon including cash items in the process of collection.

(b) State, municipal, federal and other securities.

(c) All federal funds sold and all securities purchased under agreements to resell, if any, plus any accrued interest thereon.

(d) Furniture, fixtures, equipment, office supplies, and safe deposit boxes.

(e) Real estate owned by the Bank, including Bank premises.

(f) All loans together with all collateral of whatever nature taken as security therefor.

(g) All interests, rights, claims or causes of action under any of the Bank's Directors' and Officers' Liability and other insurance policies or contracts, or any bankers' blanket bonds or

All interests, rights, claims or causes of action under any of the Bank's Directors' and Officers' Liability and other insurance policies or contracts, or any bankers' blanket bonds or other surety bonds or contracts, including premium refunds, unearned premiums derived from cancellation, or any proceeds payable from such policies, bonds or contracts.

Subsection (j) provides for the sale of "other assets." Schedule B describes the assets more specifically, listing total values for currency and coin, moneys due from other banks, investment securities, loans, fixed assets, real estate, customer liability under letters of credit, claims and judgments, total accrued income receivable-loans, and miscellaneous other assets. Schedule B also lists:

(1) All tax refunds including those relating to net operating loss carry back from state and federal income tax returns filed or to be filed by Mid Valley Bank.

(2) All rights and claims under all bonds and policies of property, title, casualty, liability (including director's and officer's liability) insurance policies.

(3) *all assets owned by Mid Valley Bank and not reflected on the Bank's books on August 28, 1986.* (emphasis added)

Schedule B then lists excluded assets not purchased by the new bank under the agreement.[7]

It is plaintiff's position that the language of subparagraph (g) merely assigns the *right to insurance protection for "respondeat superior"* liability for acts of officers and directors, but that it does not assign lawsuits against officers and directors. It is not necessary to determine whether plaintiffs' argument has merit, for plaintiffs ignore the remainder of the language of the agreement, whereby *all assets,* including those not reflected on the bank's books, were conveyed to First Bank.

Causes of action, including shareholder derivative suits, are intangible assets of a corporation, which pass to a purchaser with the sale of other assets. *Lewis v. Chiles,* 719 F.2d 1044, 1047 (9th Cir.1983).

█ Where an agreement expressly identifies excluded assets, and then conveys "all assets" except those so excluded, there is no room for a finding of ambiguity in its language. It is not the court's function to make another or different contract in the guise of construing or interpreting a contract. *Poggi v. Tool Research & Eng'r Corp.,* 75 Wash.2d 356, 364, 451 P.2d 296 (1969). Much less is it the court's function to make a new contract for the benefit of individuals who were not even parties to that contract.

Should the court find that the contract's language is capable of more than one meaning, then, as stated above, it is the court's duty to determine the intent of the parties to that contract, by examining the contract as a whole and considering all of the circumstances surrounding its execution, including the subject matter and the subsequent acts of the parties. None of the parties to the contract have asserted that its language is ambiguous. Rather, they are in agreement that it conveyed *all* assets of Mid Valley Bank, including any potential lawsuits, to First Bank, with the exclusion of the 4 listed loans. Plaintiffs cite no authority in support of a court interpreting a contract according to the wishes of a third party, where the parties to the contract are in complete agreement as to its terms, and the third party is unable to advise the court regarding their intent.

Given the lack of ambiguity in the Purchase and Assumption Agreement's language, plaintiffs are not entitled to pursue those claims absent its invalidation. In a similar situation the Fourth Circuit stated:

---

other surety bonds or contracts, including premium refunds, unearned premiums derived from cancellation, or any proceeds payable from such policies, bonds or contracts.
   (h) Accrued but uncollected income.
   (i) Prepaid expenses.
   (j) Other assets.

7. The excluded assets were the following loans, with balances as of April 30, 1986:

| | |
|---|---|
| Columbia River Orchards | – $27,714 |
| Hillside Apple Orchard | – $14,718 |
| Lakeside Orchard | – $28,286 |
| Spring Creek Orchard | – $26,090 |

We see no error in the district court's determination that FDIC acquired apparent title to all choses in action against officers, directors, and employees of Bank and ABTS for harm visited upon Bank.... The only grounds upon which its title may be defeated are a successful attack upon the validity of its appointment as receiver, or upon the validity of its sale and purchase.

*Federal Deposit Ins. Corp. v. American Bank Trust Shares, Inc. (ABTS),* 558 F.2d 711, 714–15 (4th Cir.1977).

Since the court has determined that, as a matter of law, the contract is unambiguous, there is no material issue of fact in dispute regarding ownership of the mismanagement claims. Since such claims no longer belong to the Mid Valley Bank estate, plaintiff lacks standing to pursue them.

## DUE PROCESS/INVALIDATION OF THE PURCHASE AND ASSUMPTION AGREEMENT

Plaintiffs also seek a declaration that the purchase and assumption agreement is invalid.[8] It does not appear that they are asking this court to make such a declaration, but rather wish to proceed in the Okanogan County Superior Court which approved the sale. They have, however, asked this court to declare that the Supervisor's estate owns a claim against the Banking Supervisor for illegally licensing First Bank Washington.

The essence of plaintiff's complaint regarding the Purchase and Assumption Agreement is the lack of notice. RCW 30.44.020 permits the Supervisor to take possession of a bank without notice when the bank is in an unsafe condition.[9] The issue of constitutionality of statutes authorizing seizure of an insolvent bank's assets without notice was first addressed by the Supreme Court in *Fahey v. Mallonee,* 332 U.S. 245, 67 S.Ct. 1552, 91 L.Ed. 2030 (1947). In *Fahey* stockholders alleged that the Conservator seized the bank's property without due process of law, motivated by malice and ill will. The Conservator had been appointed by the Federal Home Loan Bank Administration without notice or a hearing, on the grounds that the bank was conducting its affairs in an unlawful, unauthorized, and unsafe manner. The court recognized that this procedure was drastic, but held that due to the delicate nature of banking and the impossibility of preserving credit during an investigation, it was not unconstitutional. *Id.,* at 253–54, 67 S.Ct. at 1555–56.

---

8. It should be noted that if plaintiffs succeed in invalidating the P & A Agreement, Mid Valley Bank supervisor's estate will re-acquire not only the causes of action against the officers and directors, and claims on the insurance policies, they will also re-acquire all the debts that put MVB into insolvency in the first place. If the alleged preference to CVB is set aside and returned to MVB, then CVB will become a creditor with priority over any interest of the shareholders. First Bank Washington asserts that they have experienced $8.2 million in losses since taking over MVB, plus FDIC's $3+ million.

9. RCW 30.44.020 provides:
Whenever it shall in any manner appear to the supervisor of banking that any offense or delinquency referred to in RCW 30.44.010 renders a bank or trust company in an unsound or unsafe condition to continue its business or that its capital or surplus is reduced or impaired below the amount required by its articles of incorporation or by this title, or that it has suspended payment of its obligations or is insolvent, said supervisor may notify such bank or trust company to levy an assessment on its stock or otherwise to make good such impairment or

offense or other delinquency within such time and in such manner as he may specify or if he deems necessary he may take possession thereof without notice....
RCW 30.44.010 provides:
Whenever it shall in any manner appear to the supervisor that any bank or trust company has violated any provision of law or is conducting its business in an unsafe manner or that it refuses to submit its books, papers, or concerns to lawful inspection or that any director or officer thereof refuses to submit to examination on oath touching its concerns, or that it has failed to carry out any authorized order or direction of an examiner, the supervisor may give notice to the bank or trust company so offending or delinquent or whose director or officer is thus offending or delinquent to correct such offense or delinquency and if such bank or trust company fails to comply with the terms of such notice within thirty days from the date of its issuance or within such further time as said supervisor may allow, then the supervisor may take possession of such bank or trust company as in case of insolvency.

The next issue concerns the lack of notice prior to execution by the receiver/supervisor of the Purchase and Assumption Agreement. Though Washington's statute does not expressly authorize purchase and assumption agreements, they are consistent with the broad authority granted to the banking supervisor by the statute,[10] and recognized by the Washington Supreme Court.[11] The two superior courts in Washington which have been faced with petitions for approval of purchase and assumption agreements have done so in ex parte proceedings without notice to shareholders, depositors or creditors.[12] In addition, Washington's statute contains nearly identical language to that of the National Banking Act,[13] which has been held to authorize such agreements. *See, e.g., In re Receivership of Penn Square Bank, N.A.,* 556 F.Supp. 494, 497 (W.D.Okla.1983); *In re Liquidation of American City Bank and Trust Company, N.A.,* 402 F.Supp. 1229, 1231 (E.D.Wisc.1975); *In re Liquidation of Franklin National Bank,* 381 F.Supp. 1390, 1393 (E.D.N.Y.1974).

Several courts have addressed the rationale behind the standard procedure of selling a bank's assets via a purchase and assumption agreement on the same day as takeover by the Supervisor/Receiver. *See Gunter v. Hutcheson,* 674 F.2d 862 (11th Cir.) *cert denied,* 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982); *Telegraph v. Schilling,* 807 F.2d 590 (7th Cir.), *cert denied,* — U.S. —, 108 S.Ct. 73, 98 L.Ed.2d 37 (1986). The purchase and assumption agreement is utilized whenever possible in order to avoid the problems inherent in liquidation. Through such agreements, the FDIC or Bank Supervisor attempts to arrange for another bank to purchase the failed bank and reopen it without any interruption in banking operations, and without loss to the depositors. The agreement involves three entities: the receiver of the failed bank, the purchasing bank, and the FDIC as insurer. In many instances the FDIC is also appointed as the receiver by the banking authority, thereby acting in two capacities, as receiver and as corporate

**10.** RCW 30.44.050 provides:

Upon taking possession of any bank or trust company, the supervisor shall proceed to collect the assets thereof and to preserve, administer and liquidate the business and assets of such corporation. With the approval of the superior court of the county in which such corporation is located, he may sell, compound or compromise bad or doubtful debts, and upon such terms as the court shall direct borrow, mortgage, pledge or sell all or any part of the real estate and personal property of such corporation. He shall deliver to each purchaser or lender an appropriate deed, mortgage, agreement of pledge or other instrument of title or security....

**11.** In *In re Cashmere State Bank,* 169 Wash. 258, 13 P.2d 892 (1932), the Supreme Court, in affirming the authority of the bank supervisor to borrow money, pledging the assets of the bank as collateral, held that, although neither the statute nor judicial decision expressly conferred such authority upon the supervisor, the court felt impelled to "place such construction upon the statute as will enable him to administer speedily, adequately and comprehensively the trust imposed upon him." *Id,* at 263, 13 P.2d 892. It recognized that statutes cannot provide for "every minute detail of operation," and that authority "coextensive with the nature of the office and the object to be accomplished must be inferred, and the necessary power to function therein implied." *Id,* at 264, 13 P.2d 892. Therefore, whatever was reasonably necessary

to enable the supervisor to effect as great and speedy a return a possible to those entitled to it is included within the supervisor's authority. *Id,* at 265, 13 P.2d 892.

**12.** Approval of the purchase and assumption agreement which is the subject of this litigation was granted by the Okanogan County Superior Court in Cause No. 86–2–00308–0, without notice. The Superior Court for King County, in Cause No. 88–2–1119–6–1, approved the sale of Liberty Bank of Seattle's assets to Emerald City Bank, also without notice. Though in that case the bank supervisor appointed the FDIC as receiver, it too involved a single bid to purchase the assets, and provided for an assumption of risky loans by FDIC. In the King County case the court approved the sale on Friday, June 17, 1988, to be effective upon actual take-over by the bank supervisor, which was to occur at the end of the same business day. Ct.Rec. 51.

**13.** 12 U.S.C. § 192 provides, in part, that:

Such receiver, under the direction of the Comptroller, shall take possession of the books, records and assets of every description of such association, collect all debts, dues, and claims belonging to it, and, upon the order of a court of record of competent jurisdiction, may sell or compound all bad or doubtful debts, and, on a like order, may sell all the real and personal property of such association, on such terms as the court shall direct.

insurer. *See FDIC v. Ashley,* 585 F.2d 157 (6th Cir.1978).

As soon as it becomes apparent that the bank is in jeopardy, the FDIC or the Bank Supervisor begins to look for potential buyers, with the goal of having such a buyer evaluated and approved before the bank's doors are closed by the Supervisor. If more than one bank is interested, the FDIC/Supervisor solicits bids for the "going concern" value of the bank, including assumption of its liabilities. The bids are evaluated for feasibility according to the statutory requirements of 12 U.S.C. § 1823(e) if the FDIC is the receiver, or according to state law if the State Banking Supervisor will take over the bank.

> While the purchase of a failed bank is an attractive way for other banks to expand their operations, a purchase and assumption must be consummated with great speed, usually overnight, in order to preserve the going concern value of the failed bank and avoid an interruption in banking services. Because the time constraints often prohibit a purchasing bank from fully evaluating its risks, as well as to make a purchase and assumption an attractive business deal, the purchase and assumption agreement provides that the purchasing bank need purchase only those assets which are of the highest banking quality. Those assets not of the highest quality are returned to the receiver, resulting in the assumed liabilities exceeding the purchased assets. To equalize the difference, the FDIC as insurer purchases the returned assets from the receiver which in turn transfers the FDIC payments to the purchasing bank. The FDIC then attempts to collect on the returned assets to minimize the loss to the insurance fund. In an appropriate case, therefore, the purchase and assumption benefits all parties. The FDIC minimizes its loss, the purchasing bank receives a new investment and expansion opportunity at low risk, and the deposi-

tors of the failed bank are protected from the vagaries of the closing and liquidation procedure.

*Gunter v. Hutcheson, supra,* at 865–66.

Speed is an essential element of such agreements. A purchase and assumption transaction is only feasible if completed before the depositors know that their bank is insolvent and in receivership. Once they find out, they will begin withdrawing their deposits, leaving little or nothing for the assuming bank to acquire. *Telegraph Sav. & Loan Ass'n v. Schilling, supra* at 591. Nor is blocking withdrawals the solution, since the result will be to anger the depositors, thereby making it difficult to induce them to transfer their loyalties and trust to the new bank. Deposit insurance will not prevent a run, at least to the extent of deposits in excess of the insurance limit. In addition, there is necessarily a time lag in paying depositors, resulting in hardship and lack of confidence in the banking industry. *Id.,* at 592.

Prior notice has the additional disadvantage in that the resulting withdrawals would result in loss of the very agreement being negotiated. No purchaser would agree to pay the same "going concern" value for a bank after a run on it by its depositors. The result would be an even greater loss to the FDIC.

■ Though it is thus clear that prior notice is not constitutionally mandated, and would be prejudicial to the interests of the depositors and the FDIC, the issue of subsequent notice remains. In *Fahey* the court contemplated the opportunity for a hearing after the fact. It is plaintiff's position that no adequate opportunity for a hearing was given to the stockholders in MVB, subsequent to the take-over by the Supervisor.

The only provision in Washington's statute for a hearing regarding bank take-overs is that contained in RCW 30.44.030 [14]

---

14. RCW 30.44.030 provides:
Within ten days after the supervisor takes possession thereof, a bank or trust company may serve a notice upon the supervisor to appear before the superior court of the county

wherein such corporation is located and at a time to be fixed by said court, which shall not be less than five nor more than fifteen days from the date of service of such notice, to show cause why such corporation should not be re-

for bank challenges to the seizure of its assets by the supervisor. This section provides for ten days in which to challenge the take-over. Plaintiffs do not assert that the take-over itself was improper. However, they assert that since the shareholders were not given notice of either the seizure or the sale of assets in a time or manner likely to result in a meaningful opportunity to be heard, that their constitutional rights to due process were violated.

Provisions similar to Washington's have been upheld by other courts. In *Fifer v. Williams,* 5 F.2d 286 (9th Cir.1925), creditors and depositors objected to the sale of an insolvent national bank's assets by a statutory receiver. The district court had ordered that general notice be given prior to the sale. After conducting a hearing the court approved the sale and plaintiffs appealed. The Ninth Circuit held that the fact that the judge had sought information, had directed that notice be published, and a hearing held did not change the administrative character of the proceedings. It stated that:

> No statute gave the objectors any legal right to demand to be heard or to be made parties to the proceeding; nor is there any statutory provision for an appeal from an order for the sale of the assets of an insolvent national bank. For an attempt to make an illegal or fraudulent sale, doubtless, a remedy by suit would lie, and from a decision in such a suit appeal could be taken to this court, but that is aside from the matter before us.

*Id.,* at 289.

In *Roslindale Cooperative Bank v. Greenwald,* 638 F.2d 258 (1st Cir.), *cert. denied* 454 U.S. 831, 102 S.Ct. 128, 70 L.Ed. 2d 108 (1981), the court held that where Massachusetts statutes provided for a postevent hearing whenever the bank deemed itself aggrieved by the seizure, and the bank was allowed to file an objection within ten days, this proceeding satisfied the requirements of due process. *Id.,* at 261. The court pointed out that there was a statutory proceeding available for a hearing, and refused to allow the plaintiffs to "bootstrap themselves into the federal court by failing to seek it." *Id.* When claimants have made no attempt to avail themselves of existing state procedures, "a claim of lack of available due process fail[s] *on the merits* [where] there [is] a process available under state law." *Boston Env. Sanitation Inspectors Ass'n v. Boston,* 794 F.2d 12, 13 (1st Cir.1986) (emphasis in original).

In *Gregory v. Mitchell,* 459 F.Supp. 1162 (D.Ala.N.D.1978), the court faced a situation similar to that before this court, when majority stockholders brought a suit under 42 U.S.C. § 1983, alleging that their constitutional right to due process had been violated when the Macon County Bank was closed and its assets sold. The bank directors were notified of a hearing by the State Banking Board to consider the bank's condition. No director or officer appeared. The Board voted to have the bank superintendent seize the bank. The same day the FDIC was appointed as receiver. The following day the Court granted the FDIC's ex parte petition confirming FDIC's position as receiver, and the next day it also approved an ex parte sale of the bank's assets pursuant to a purchase and assumption transaction. After finding that the plaintiffs had received notice of the hearing regarding the bank's condition, the court held that due process had been satisfied. It went on to state that "the sale of the bank's assets without notice was not a denial of due process. The 'taking' of the bank's property occurred when the bank was seized. The state need not provide notice and opportunity to be heard at each stage of the liquidation process." *Id.,* at 1166.

stored to the possession of its assets. Upon the return day of such notice, or such further day as the matter may be continued to, the court shall summarily hear said cause and shall dismiss the same, if it be found that possession was taken by the supervisor in good faith and for cause, but if it find that no cause existed for the taking possession of such corporation, it shall require the supervisor to restore said bank or trust company to possession of its assets and enjoin him from further interference therewith without cause.

In the case before this court, plaintiffs do not allege that the officers and directors of the bank were unaware of the pending seizure of the bank. It had been officially determined to be in an unsafe condition on September 25, 1985, and a Supervisory Directive was issued on that date instructing the bank and its directors to take steps to improve that condition.[15] Due to further deterioration in the bank's condition, a Supplemental Supervisory Directive was issued on May 5, 1986 (Ct.Rec. 33, Findings of Fact). Mid Valley Bank failed to comply. On Friday, August 29, 1986, the acting president, Butterfield, was given written notice that the Supervisor was taking possession (Ct.Rec. 33, Affidavit of Butterfield).

Plaintiffs cite no authority for their proposition that shareholders were entitled to notice of any pending court proceedings. The officers and directors of Mid Valley Bank were fully aware that the bank's assets would be seized if the bank failed to comply with the Supervisory Directive. No one alleges that the officers and directors were unaware of the actual seizure itself. Nor do plaintiffs allege that they would have challenged that seizure had they received notice; rather, they concede that seizure was necessary to prevent further deterioration of assets (Ct.Rec. 22, pg. 10). No challenge was made by the bank of that seizure. Therefore, the bank has waived any right to challenge the seizure. Since shareholders have no greater rights in pursuing derivative claims than the corporation itself, they too are precluded from now challenging the seizure. *First Savings & Loan Ass'n v. First Savings & Loan Ass'n of Hawaii*, 547 F.Supp. 988, 995 (D.Hawaii, 1982).

Plaintiffs also assert that the failure of the supervisor to submit an itemized inventory violates RCW 30.44.070 [16], and that the Superior Court likewise violated RCW 30.-44.050 [17] by failing to "direct the terms" of the sale. First Bank points out that the purchase and assumption agreement contains a list of the assets being acquired, as well as lists of liabilities and agreements assumed, although these admittedly were itemized only by category. Given the nature of the court's role in such proceedings, as set forth below, plaintiffs' position lacks merit.

*Nature of Proceedings Approving Sale*

The Ninth Circuit has held that, due to the nature of statutory receivership proceedings, it is without authority to review an order by a district court approving the sale of a national bank's assets by a statutory receiver. *Fifer v. Williams, supra.* Montana law, in language essentially identical to Washington's RCW 30.44.050, permits the receiver to take possession of all bank assets and provides that he may, "upon order of a court of record of competent jurisdiction, ... sell all the real and personal property of such association on such terms as the court shall direct." *Id,* at 287. The court in *Fifer* held that by the application for receivership the receiver did not submit himself and the bank's affairs to the jurisdiction of the court, nor was he an officer of the court, nor did he place the bank's assets under the control of the court in the sense in which control is acquired when a receiver is appointed by the court. Rather, the receiver

belongs to the executive branch of the government, and his custody of assets is

---

**15.** The Supervisory Directive instructed the bank to reduce its classified assets, prepare and implement a plan to increase the bank's capital, maintain capital at acceptable levels, implement a sound credit program, increase loan loss reserves, and establish a plan to increase earnings of the bank (Ct.Rec. 33, Findings of Fact).

**16.** RCW 30.44.070 provides:
    Upon taking possession of such corporation, the supervisor shall make an inventory of the assets in duplicate and file one in his office and one in the office of the county clerk. Upon the expiration of the time fixed for the presentation

of claims, he shall make a duplicate list of claims presented, segregating those approved and those rejected, to be filed as aforesaid....

**17.** RCW 30.44.050 provides in part:
    Upon taking possession of any bank or trust company, the supervisor ... [w]ith the approval of the superior court ... may sell, compound or compromise bad or doubtful debts, and upon such terms as the court shall direct ... sell all or any part of the real estate and personal property of such corporation....

not that of the court.... There is no suit; no parties in the legal understanding of the term; no process must issue; no one is authorized to appear on behalf of the receiver or any one else, or to subpoena witnesses. It is an ex parte proceeding, and, though by the will of Congress put under judicial cognizance, is not by its own nature a judicial controversy.

*Id.*

The Seventh Circuit concurred in this view of the nature of statutory receiver proceedings. In *Mitchell v. Joseph,* 117 F.2d 253 (7th Cir.1941) [18] the court stated that a receiver of a national bank may sell assets only when so directed by a court of competent jurisdiction. *Id.,* at 254. However, the court in so directing is dealing "not with an order entered in a judicial proceeding, but rather with an administrative approval of a subordinate governmental executive officer's action." *Id,* at 255. The receiver is not an officer of the court, and the court enters a discretionary administrative approval, not a judicial decision. The court went on to state

> The entry of approval constitutes neither a suit at law nor one in equity. It presents no justiciable controversy. It involves the entry of no judicial order or judgment which may be reviewed by an appellate court. The actions of the receiver are purely administrative and the requirement of the statute [12 U.S.C. § 192] that he obtain an approval from the court accomplishes nothing other than the designation of the court as a superior and advisory administrative officer. Its approval is merely an administrative condition precedent to the congressionally granted executive power to sell. It is a precautionary check upon the otherwise unconditioned, unlimited power of the Comptroller. The court's exercise of executive discretion is not subject to judicial review.

*Id.* at 255; citing *Hulse v. Argetsinger,* 18 F.2d 944 (2nd Cir.1927); *Roth v. Hood,* 106 F.2d 616 (6th Cir.1939), and *Fifer, supra.*

■ Thus, absent evidence that the court acted without substantial evidence or that its decision was arbitrary and capricious, the court's order approving a sale by a receiver is not subject to review. *Roth v. Hood, supra* at 618.

### Propriety of Sale to Firstbank

In his amended complaint, plaintiff alleges that the sale to First Bank was a violation of RCW 30.04.230. Plaintiff also alleges a conspiracy between the Supervisor and First Bank regarding the sale of assets to First Bank and the licensing of First Bank Washington. The essence of plaintiff's argument is that First Bank Washington was illegally licensed to do business in Washington, and that the Supervisor's and First Bank's actions deprived Mid Valley Bank of the value of its license, to the injury of the stockholders.

Under RCW 30.04.230, an out of state holding company is not permitted to acquire all, or substantially all, of the assets of a bank whose principal operations are conducted within Washington, unless the supervisor of banking finds that: (1) the bank being acquired is insolvent or in danger of closing; (2) there is no state bank, or national bank already doing business in Washington, with sufficient resources that is willing to acquire the entire bank on terms at least as favorable as the out-of-state bank holding company offers; and (3) the applicant bank has an acceptable record of meeting the credit needs of its entire community, including low and moderate income neighborhoods. The supervisor is directed to consider the financial institution structure of Washington and the convenience and needs of the public of this state in reaching his decision whether to approve the sale.

18. In *Mitchell* the receiver contracted to sell certain bank real estate, in accordance with 12 U.S.C. § 192, provided the sale be approved by the District Court. Following forfeiture of the contract the receiver petitioned the court for an ex parte vacation of the order of approval. The purchaser subsequently brought suit to recover his earnest money, contending that the receiver had no authority to enter into the contract.

■ In approving First Bank Systems application to acquire MVB's assets and liabilities, the banking supervisor entered findings of fact which paralleled the statutory requirements for such approval (Ct. Rec. 43, Exhibit A). Absent evidence that the documents provided by First Bank Systems to the supervisor were fraudulent, there is no basis for a finding that the sale exceeded the supervisor's authority or was in any manner improper. Plaintiff has neither alleged nor come forward with any evidence of fraud. Plaintiffs have made no showing of falsification or misrepresentation in those documents, nor have they pointed to any errors in the supervisor's findings of fact. Therefore, plaintiffs have failed to meet their burden to come forward with more than mere allegations of wrongdoing in order to withstand defendants' motions for summary judgment. Plaintiffs have offered no evidence from which a reasonable juror could return a verdict in their favor.

Since there is no evidence of impropriety in First Bank's acquisition of Mid Valley Bank's assets, there can be no conspiracy. A conspiracy must be a combination of persons either to achieve an illegal purpose, or to achieve a purpose by illegal means. *Lewis Pacific Dairymen's Ass'n. v. Turner,* 50 Wash.2d 762, 772, 314 P.2d 625 (1957). "Where the facts and circumstances relied upon to establish a conspiracy are as consistent with a lawful or honest purpose as with an unlawful undertaking, they are insufficient" to support a conspiracy. *Id.* Washington law permits out-of-state holding companies to acquire Washington banks when the statutory conditions are met. The supervisor of banking's findings indicate that those conditions were complied with. The evidence supports a finding of both a lawful act and a lawful means of accomplishing that act. Plaintiffs' allegations of conspiracy are general and conclusory and find no support in the record, therefore they are insufficient to state a claim upon which relief can be granted, *North Star Intern v. Arizona Corp. Com'n.,* 720 F.2d 578, 583 (9th Cir. 1983); *First State Bank of Northern California v. Bank of America,* 618 F.2d 603,

604 (9th Cir.1980), and insufficient to withstand a motion for summary judgment under the *Celotex* trilogy analysis.

PREFERENCE

Plaintiffs allege that MVB's settlement of the lawsuit with Central Valley Bank (CVB), regarding the Johnson, Colbert, and Northwest Paving loans, constituted an unlawful preference in violation of RCW 30.-44.110, which provides that any transfer of a bank's property or assets made in contemplation of insolvency or after it has become insolvent, with a view to the preference of one creditor over another, or to prevent the equal distribution of its assets among its creditors, shall be void. Plaintiffs allege that the settlement involved a payment to CVB from MVB assets, and a reassumption of a portion of the loans by MVB (Ct.Rec. 30, pg. 9–12), and that as this occurred only a few days before the bank take-over, it was unlawful.

Defendant First Bank responds by asserting that should the settlement be set aside, then Central Valley Bank would be a creditor for the amount of its judgment, with priority over the shareholders (Ct.Rec. 33, pg. 35). To the extent that the settlement concerned claims not yet reduced to judgment, CVB would not be in the position of a preferred, as opposed to a general creditor. However, if they succeeded in proving their claim to the supervisor they would necessarily have priority over the shareholders. Thus, plaintiffs would only benefit if Central Valley Bank was unsuccessful in proving their claim to the supervisor. As to the payment of the judgment on the first lawsuit with Central Valley Bank, if that were set aside it is clear that CVB would be in the position of a preferred creditor, and the shareholders would gain nothing by having it set aside.

■ This issue again raises the question of a stockholder's standing to litigate the preference issue. Generally preferences concern the relationship between various creditors. A stockholder is not a creditor, as such, of the corporation whose stock he owns. *In re Puget Sound Savings & Loan Ass'n,* 49 F.2d 922 (W.D.

Wash.1931). The *Puget Sound* court cited a Fifth Circuit opinion stating that

> Rights possessed by one by reason of his relation to a corporation as a stockholder do not make him a creditor of the corporation, and liabilities of a corporation to its stockholders on account of their stock are not debts of the corporation within the [bankruptcy act].

*Id.*, at 925, citing *Curtis v. Dade County Securities Co.*, 30 F.2d 325, 326 (5th Cir. 1929). The *Puget Sound* court also pointed out that the Washington statute[19] provided that *"after paying indebtedness* the assets reduced to cash shall be distributed among the *shareholders"*, thereby clearly distinguishing between creditors and shareholders. *Id.* Such shareholders only become creditors after they become entitled to computed dividends from net earnings, and then only to the extent of their right to such dividends. *Id.*, at 926. Under this analysis, plaintiffs are clearly not creditors of Mid Valley Bank, and therefore lack standing to assert other creditors' rights to have a preference set aside. To the extent that they would have a right, after all creditors are paid, to distribution of any remaining assets not conveyed to First Bank, it could be argued that they do have an interest in the outcome. However, again their only recourse is against the bank supervisor for abuse of discretion through arbitrary and capricious conduct in not suing Central Valley Bank to recover the alleged preference. As to such an alleged abuse of discretion, plaintiffs rely on bare allegations, with no evidence presented to the court to support them. Finally, this court has already held that the P & A agreement conveyed all MVB's assets, except the four excepted loans, to First Bank. This includes causes of action to recover monies paid to a creditor in an unlawful preference.

## FDIC IMMUNITY

Plaintiffs' amended complaint alleges a civil rights violation against the FDIC under 42 U.S.C. § 1983 (Ct.Rec. 30, pg. 24) due to the lack of notice or a meaningful opportunity to be heard regarding the sale of MVB's assets, to the extent that the FDIC conspired with First Bank and the supervisor in that sale. The FDIC asserts that the court lacks subject matter jurisdiction as well as personal jurisdiction over that claim.

■ As to personal jurisdiction, plaintiffs have not served a summons and complaint upon the U.S. Attorney or the Attorney General, as required by F.R.C.P. 4(d)(4)–(5). Though the FDIC initially entered this action through intervention, plaintiffs have subsequently filed an amended complaint alleging the section 1983 civil rights violation. Submission to this court's jurisdiction as an intervenor plaintiff should not be held to be consent to its jurisdiction on subsequently filed claims against it as a defendant.

■ As to subject matter jurisdiction, claims for money damages sounding in tort cannot be maintained against FDIC in its corporate capacity (as insurer) directly, but must be asserted against the United States. 28 U.S.C. §§ 1346(b), 2671 *et seq.; Safeway Portland E.F.C.U. v. FDIC*, 506 F.2d 1213 (9th Cir.1974). Permitting plaintiffs to amend their complaint to name the United States as a defendant would be futile in that they have still failed to allege in their complaint that they have satisfied the administrative claim requirements of the FTCA under section 2675(a),[20] a jurisdictional prerequisite. *Gillespie v. Civilet-*

---

**19.** Now RCW 33.40.010, providing for voluntary liquidation.

**20.** 28 U.S.C. s 2675(a) provides:

An action shall not be instituted upon a claim against the United States for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and set by certified or registered mail. The failure of an agency to make final disposition of a claim within six months after it is filed shall, at the option of the claimant any time thereafter, be deemed a final denial of the claim for purposes of this section. . . .

*ti,* 629 F.2d 637, 640 (9th Cir.1980). A district court may dismiss for failure to allege this jurisdictional prerequisite, though the plaintiff should be given the opportunity to amend his complaint to cure this defect. *Id.* However, it does not appear that plaintiffs have filed an administrative claim, therefore amending the complaint would be futile.

■ Even if plaintiffs attempt to avoid this administrative hurdle by arguing that their claim is not in tort, their claim still cannot be maintained against the FDIC under the Civil Rights Act. 42 U.S.C. § 1983 creates an action for damages against persons "acting under color of any statute, regulation, custom, or usage of any State or Territory or the District of Columbia." The provisions of the Civil Rights Act do not apply to persons acting pursuant to federal, not state law. *Wheeldin v. Wheeler,* 373 U.S. 647, 650 n. 2, 83 S.Ct. 1441, 1444 n. 2, 10 L.Ed.2d 605 (1963). The FDIC, as a federal agency, acts pursuant to federal law, and as such is not subject to suit under the Civil Rights Act. *Daly–Murphy v. Winston,* 837 F.2d 348, 355 (9th Cir.1987); *D'Oench, Duhme, & Co. v. FDIC,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942).

### CONCLUSION

Plaintiffs lack standing to assert the claim against the officers and directors of MVB. It passed to the Bank Supervisor upon seizure of the bank, and was validly conveyed to First Bank and FDIC. Causes of action are intangible assets which are transferred to the purchaser along with other assets at the time of sale. There is no ambiguity in the purchase and assumption agreement and it is not violative of plaintiffs' due process rights. Such proceedings are ex parte proceedings with no right to notice or an opportunity to be heard, other than the right of the bank to challenge the appointment of the receiver. Plaintiff concedes that the seizure was necessary. The bank waived its right to challenge the seizure by not filing a timely challenge. Shareholders acting derivatively are likewise time-barred.

Plaintiffs also lack standing to assert the preference claim. Preferences concern the competing rights of creditors in an insolvent bank's assets. Shareholders are not creditors. Even if they were successful in forcing a return of the allegedly preferential payment to CVB, CVB would remain a creditor with prior rights over shareholders, subject only to proof of its claim to the supervisor. Any remaining money would pass to First Bank as an asset of the bank.

Plaintiffs' argument that the sale of the bank's assets as a going concern, including its license, is illegal, fails due to the wide recognition of such procedures to protect depositors and the FDIC, and the compliance of the supervisor with Washington laws regarding sale of domestic banks to out of state holding companies.

Since plaintiffs had no right to notice of the seizure or sale of MVB's assets, and lack standing to sue either derivatively or as beneficiaries of the bank estate for assets which are no longer part of the bank's estate, there are no genuine issues of fact in dispute precluding summary judgment. It is therefore HEREBY ORDERED that the second amended complaint and the claims therein be

DISMISSED WITH PREJUDICE.

IT IS SO ORDERED. The Clerk is directed to enter this Order and forward copies to counsel.