**TELEGRAPH SAVINGS AND LOAN ASSOCIATION, et al., Plaintiffs-Appellants,**

v.

**William J. SCHILLING, Federal Home Loan Bank Board, and Federal Savings and Loan Insurance Corporation, Defendants-Appellees.**

No. 85–1041.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 9, 1986.

Decided Dec. 5, 1986.

Rehearing and Rehearing En Banc Denied Feb. 2, 1987.

Leonard M. Ring, Leonard M. Ring & Assoc., Chicago, Ill., for plaintiffs-appellant.

John L. Rogers, III, Hopkins & Sutter, Chicago, Ill., for defendants-appellees.

Before POSNER and FLAUM, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

POSNER, Circuit Judge.

In 1980 the Federal Home Loan Bank Board determined that Telegraph Savings

& Loan Association was insolvent and appointed the Federal Savings & Loan Insurance Corporation (FSLIC), the federal agency that insures deposits in savings and loan associations, as receiver. On the same day FSLIC entered into a "purchase and assumption" transaction with First Federal Savings & Loan Association, whereby First Federal agreed, effective the next day, to assume Telegraph's liabilities (mainly to its depositors) in exchange for a cash payment from FSLIC plus Telegraph's "good" assets (furniture, fixtures, etc.). FSLIC was left to try to recoup the cash payment it had made to First Federal from Telegraph's loan portfolio, which FSLIC retained. Telegraph brought this suit against FSLIC, challenging the determination of insolvency, the appointment of the receiver, and the legality of the purchase and assumption transaction, and seeking the return of its assets. (There are other parties on both sides, but they are not important to this appeal.) The district court resolved all issues against Telegraph. In a previous appeal we upheld the court's rulings with respect to the determination of insolvency and the appointment of the receiver. *Telegraph Savings & Loan Ass'n v. Schilling*, 703 F.2d 1019 (7th Cir.1983). The present appeal is from the district court's rejection of Telegraph's challenge to the legality of the purchase and assumption transaction, and from its refusal to award Telegraph some $500,000 in attorney's fees for Telegraph's strenuous though unsuccessful efforts in this litigation.

The purchase and assumption method of liquidating an insolvent savings and loan association is expressly authorized by 12 U.S.C. § 1729(f)(2), passed in 1978 and modeled on a statute applicable to and frequently used by the Federal Deposit Insurance Corporation in dealing with bank failures. See 12 U.S.C. § 1823(f); H.R.Rep. No. 1383, 95th Cong., 2d Sess. 40 (1978), U.S.Code Cong. & Admin.News 1978, pp. 9273, 9312; Burgee, *Purchase and Assumption Transactions Under the Federal Deposit Insurance Act*, 14 Forum 1146, 1154–60 (1979); cf. S.Rep. No. 536, 97th

Cong., 2d Sess. 7 (1982), U.S.Code Cong. & Admin.News 1982, pp. 3054, 3060. Instead of paying the depositors—a procedure that both is time-consuming and does nothing for depositors insofar as their deposits exceed the insured limit—the FDIC or FSLIC, as the case may be, persuades another financial institution to assume the insolvent institution's liabilities to depositors. See, e.g., *Corbin v. Federal Reserve Bank of New York*, 475 F.Supp. 1060, 1063–65 (S.D. N.Y.1979), aff'd, 629 F.2d 233 (2d Cir.1980). Whether the agency pays the depositors directly or pays another financial institution to assume liability to them, the agency seeks to recoup the payment out of the assets of the insolvent institution. The advantage to the agency of the purchase and assumption technique is that it preserves the going-concern value of the failed institution and thus reduces the agency's loss by the excess of that value over the liquidation value of the institution. The disadvantage is that the agency makes depositors whole beyond the limits of its insurance liability to them.

Telegraph does not question the legality of the purchase and assumption transaction as such but insists that there must be 15 days' public notice of it. A regulation of the Federal Home Loan Bank Board, 12 C.F.R. § 569a (1980), requires such notice in the case of a sale of the assets of a savings and loan association by a receiver; and such a sale took place here. But we do not think the regulation is applicable. It was promulgated ten years before FSLIC was authorized by 12 U.S.C. § 1729(f)(2) to engage in purchase and assumption transactions, and not only was it not promulgated with such transactions in mind, but, if applied to them, it would frustrate them. A purchase and assumption transaction will not work unless it is completed before the depositors know that their savings and loan association is insolvent and in receivership. For once they find out, they will begin withdrawing their deposits, and there will be little or nothing for the assuming association (First Federal here) to assume. *In re Franklin Nat'l*

*Bank,* 381 F.Supp. 1390, 1392, 1393 (E.D.N.Y.1974); *In re American City Bank & Trust Co.,* 402 F.Supp. 1229, 1231 (E.D.Wis.1975). Blocking withdrawals will anger the depositors, making it difficult to induce them to transfer their loyalties to the assuming institution; so FSLIC will lose the going-concern premium to which it looks to reduce its losses on the transaction. Deposit insurance will not necessarily prevent a "run," since it takes time to collect the insurance proceeds and since some depositors have deposits in excess of the insurance limit.

Granted, it was not till several months after the transaction in this case that the Federal Home Loan Bank Board got around to issuing a regulation, 12 C.F.R. § 569a.13 (1981), that expressly makes the provisions of section 569a on which Telegraph relies inapplicable to purchase and assumption transactions; but the new regulation simply makes explicit what was already implicit. For we think it more sensible to view the statute, 12 U.S.C. § 1729(f)(2), as limiting the scope of a previously issued regulation than to view the previously issued regulation as preventing the board (unless and until it expressly changed the regulation) from effectuating the policy of the subsequently enacted statute.

It may seem that without some sort of public notice there can be no assurance that the receiver will strike the most advantageous bargain for the disposition of the insolvent institution's assets. But FSLIC knows which savings and loan associations might be interested in assuming an insolvent association's liabilities, and before making a purchase and assumption transaction it shops the interested associations, seeking the best deal. Only it does so quietly, without tipping off the depositors. Public notice would not produce better deals; it would kill the possibility of any deal; it would nullify the purchase and assumption device that Congress has expressly authorized FSLIC to use.

We add that FSLIC has a greater interest in arranging an orderly liquidation than the stockholders of the insolvent association. When the Federal Home Loan Bank Board declared Telegraph insolvent, the market value of its liabilities exceeded that of its assets by between $30 and $37 million. This meant that the stockholders had been wiped out and that FSLIC, as the insurer of the principal creditors of the association (the depositors), faced a potential loss of that magnitude. By its deal with First Federal, FSLIC managed to reduce its expected loss to roughly $12.5 million. Had it been able to find another association willing to accept an even smaller amount in exchange for assuming Telegraph's liabilities, it would have done so. It may have driven too hard a bargain, because First Federal itself later went broke and another purchase and assumption transaction had to be arranged. But what is hardly plausible is that by giving public notice FSLIC could have driven an even harder bargain; probably it would not have been able to drive any bargain.

▮ The other issue in this appeal is whether the district court erred in refusing to order FSLIC to pay the attorney's fees that Telegraph incurred in this unsuccessful litigation to recover Telegraph's assets. Prior to its amendment in 1982 (the parties agree that the unamended statute governs this case), 12 U.S.C. § 1464(d)(8)(A) provided that in a suit under the Home Owners' Loan Act by an association, or a director or officer of an association, the court "may allow to any such party such reasonable expenses and attorneys' fees as it deems just and proper; and such expenses and fees shall be paid by the association or from its assets." The district judge refused to award attorney's fees to Telegraph on two grounds: the statute does not authorize an award of fees to the losing party; in any event the just and proper award is zero because the lawsuit was "completely lacking in merit." We agree with the first ground, so need not consider the second.

The statute was amended in 1982 by inserting "which prevails" after "any such party." Telegraph argues that this shows

that the unamended statute allows an award of attorney's fees to the losing party. It adds that since the winning party can always pay himself his fee out of the association's assets, the statute must be for the benefit of the losing party, or it has no force. Of course, if the second argument were correct, it would mean that the 1982 amendment was senseless; but it is not correct. Receivership contests are not the only type of litigation under the Home Owners' Loan Act, and in most other types of litigation under the Act the plaintiff will not control the association's assets even if he wins the suit. The plaintiff may not be the association, but an officer or director. And even if the plaintiff is the association, it may obtain relief without recovering all of its assets, and in such a case it may have a claim for attorney's fees to be paid out of the assets remaining in the receiver's hands.

As for the 1982 amendment, there is no indication that Congress thought it was changing the existing law rather than merely clarifying it. If all amendments were deemed to change the existing law, Congress would find it hard to make merely clarifying amendments. The only pertinent legislative history is the following statement in the Senate Report: "This section would clarify that a court may assess attorneys' fees against the Bank Board only in the event the agency *loses* a lawsuit." S.Rep. No. 536, 97th Cong., 2d Sess. 59 (1982), U.S.Code Cong. & Admin.News 1982, p. 3113 (emphasis in original). We are given no reason not to take this language at face value. We realize the danger in relying on postenactment legislative history. A later Congress, more realistically a committee of a later Congress, seeking to undo a deal struck by an earlier one without passing retroactive legislation, may, by describing prospective legislation as "clarifying," seek to give it a retroactive effect by influencing judicial interpretation of the original law. But if that is a possibility here, Telegraph must persuade us so; and it has not carried this burden. Cf. *In re Tarnow*, 749 F.2d 464, 467 (7th Cir. 1984).

Telegraph's last argument, which is not only unpersuasive but shows the basic error of its position, is that unless the association can pay its attorneys out of the association's assets whether it wins or loses the case, it will not be able to finance litigation challenging FSLIC's seizure of its assets. Contingent-fee contracts exist to finance litigation in which the plaintiff has no assets other than what the litigation may yield him if he wins; and in fact Telegraph had a contingent-fee arrangement with its lawyers in this case, under which they would have received up to 25 percent of the value of the assets recovered by the suit if any had been recovered. If a firm is snuffed out by a competitor and brings an antitrust suit, it can obtain legal representation, even though it has no assets other than its antitrust claim, by signing a contingent-fee contract. If, coming closer to home, a creditor seizes all of a debtor's assets, the debtor, if he thinks the seizure was wrongful, will hire a lawyer on a contingent-fee basis to contest it.

Telegraph is contending for a reading of the statute under which losing plaintiffs would routinely recover their attorney's fees from winning defendants. So startling a reversal of the traditional rules of the game should not be lightly imputed to Congress. The standard American rule is that even a winning litigant must bear his legal expenses, *Alyeska Pipeline Service Co. v. Wilderness Soc'y*, 421 U.S. 240, 247, 95 S.Ct. 1612, 1616, 44 L.Ed.2d 141 (1975); it would be grotesque to suppose that he must bear the loser's as well. That would be the effect of giving Telegraph its attorney's fees. Not only would FSLIC have incurred its own legal expenses in defending the seizure of Telegraph's assets; those assets, out of which it seeks to recoup the expense of paying First Federal to assume Telegraph's liabilities, would be further depleted by being applied to defray Telegraph's legal expenses. By making litigation a free good to Telegraph, this approach would encourage Telegraph to persist, as it has done, in a losing lawsuit. This is not what Congress had in mind

when it enacted the fee-shifting statute. It meant to lighten the burden of meritorious litigation to the winner.

In *Ruckelshaus v. Sierra Club,* 463 U.S. 680, 103 S.Ct. 3274, 77 L.Ed.2d 938 (1983), the Supreme Court rejected the argument that a court could award the loser his attorney's fees under a statute (42 U.S.C. § 7607(f), part of the Clean Air Act) which provided that "in any judicial proceeding under this section, the court may award costs of litigation (including reasonable attorney and expert witness fees) whenever it determines that such award is appropriate." This language suggested as broad a delegation to the court as the language of the present statute; yet that did not prevent the Court from (in effect) inserting "to the prevailing party" between "award" and "costs." In *Bittner v. Sadoff & Rudoy Industries,* 728 F.2d 820, 829 (7th Cir. 1984) (dictum), we made a similar insertion in a statute (29 U.S.C. § 1132(g)(1), part of ERISA) which provides that "in any action ..., the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." See also *Avoyelles Sportsmen's League v. Marsh,* 786 F.2d 631, 634 (5th Cir.1986); *Fase v. Seafarers Welfare & Pension Plan,* 589 F.2d 112, 116 (2d Cir.1978) (dictum) (Friendly, J.).

There is only a superficial appeal to Telegraph's argument that it should be entitled to contest the seizure of "its" assets. It was allowed to contest the seizure, and very vigorously has it done so. The litigation has shown that the assets are not its assets but FSLIC's. As the representative of Telegraph's principal unsecured creditors, the depositors, FSLIC has—much like a trustee in bankruptcy—seized the assets of its insolvent creditor in an effort to minimize its losses. And losses there have been. Although Telegraph speaks loosely, indeed wildly, of FSLIC having made a "profit" by arranging the purchase and assumption transaction with First Federal, the transaction yielded not a profit but a reduction in loss. The loss will still be in the millions. We can think of no reason why that loss should be augmented by forcing FSLIC to pay the legal expenses incurred by its debtor in litigation in which the debtor has unsuccessfully sought to prevent FSLIC from minimizing FSLIC's loss.

AFFIRMED.