**FIRST BANK, a State Bank; Edward V. Lohman, David E. Lohman, Richard V. Lohman, and such other shareholders of First Bank of Colorado Springs as may hereinafter elect to join in such action, Plaintiffs-Appellants,**

v.

**STATE of Colorado, DEPARTMENT OF REGULATORY AGENCIES, DIVISION OF BANKING; Ralph E. Mires, State Bank Commissioner; and all members of the Colorado State Banking Board, Defendants-Appellees.**

No. 92CA0386.

Colorado Court of Appeals, Div. V.

April 22, 1993.

Eason, Sprague & Wilson, P.C., Richard L. Eason, Eugene M. Sprague, Denver, Duitch & Ogawa, P.C., Dean T. Ogawa, Colorado Springs, for plaintiffs-appellants.

Gale A. Norton, Atty. Gen., Raymond T. Slaughter, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., Richard H. Forman, Senior Asst. Atty. Gen., Denver, for defendants-appellees.

Opinion by Judge BRIGGS.

Petitioners, First Bank and certain former directors and shareholders (collectively the Bank), appeal the judgment of the district court affirming the order of the Colorado State Banking Board (Board). In its order, the Board denied the Bank's request to rescind the Board's earlier order for possession and liquidation of First Bank's assets. The Bank contends the Board misapplied statutory procedures and violated the Bank's right to due process. We affirm.

First Bank was a state commercial bank chartered under § 11–3–110, C.R.S. (1987 Repl.Vol. 4B). In April of 1989, the Division of Banking in conjunction with the Federal Deposit Insurance Corporation (F.D.I.C.) conducted an examination of First Bank. That investigation disclosed that First Bank was inadequately capitalized. Therefore, on June 9, 1989, pursuant to § 11–3–104, C.R.S. (1987 Repl.Vol. 4B), the Board issued a notice of impairment and order to levy an assessment.

First Bank filed suit, challenging this order. The suit was dismissed upon the parties' stipulation that the Board would rescind the June 9, 1989, order and conduct another examination of First Bank independent of F.D.I.C.

The new examination again revealed First Bank's adjusted capital was negative. The examiner also concluded that First Bank's capital position had deteriorated since the April examination.

Consequently, the Board on August 8 issued another notice of impairment and order to levy an assessment. This order required the shareholders to inject $2.6 million in capital into First Bank, and it was to charge-off its loans classified as "losses" and "doubtful," pursuant to Board regulation, on or before September 13, 1989. The Board also notified First Bank that if it did not comply with the order "the [Board] may proceed to take action pursuant to [Colo.Sess. Laws 1989, ch. 93, § 11–5–102 at 539] or the bank may offer the shares of the defaulting stockholders for sale at public auction at a price which shall not be less

than the amount of the assessment and the cost of the sale."

On September 7, First Bank requested an extension of time to comply with the order. The Board, by its letter of September 11, notified First Bank, its directors, and its attorney that it had granted an extension until October 5, 1989. The letter also stated in relevant part:

If the required capital is not raised by the close of business on October 5, 1989, the Board will proceed to conduct a hearing pursuant to [Colo.Sess. Laws 1989, ch. 93, §§ 11–5–102(1) and 11–5–102(3)(b) at 539].... During the hearing, representatives for [the Bank] will be provided an opportunity to show cause as to why the Board should not take immediate possession of the Bank and liquidate the Bank.

The Division of Banking on September 15 conducted another examination. The examiners determined that First Bank's capital had continued to deteriorate. The Board sent a letter to First Bank and its directors in conjunction with the examiner's report. The letter stated in pertinent part:

The examination indicates continued deterioration in the quality of the Bank's assets and underscores that the survival of the Bank is dependent upon immediate capital contribution.

. . . .

This [report] may assist you in preparing for the hearing scheduled on October 6, 1989.

First Bank failed to inject the requisite amount of capital by October 5. A hearing had been scheduled for the next day to determine whether the commissioner should take possession of First Bank and liquidate its assets. Notice had been provided to First Bank and all its officers and directors, who together owned 88% of the outstanding capital stock.

The parties receiving notice appeared by counsel, who objected to the sufficiency of the notice under Colo. Sess. Laws 1989, ch. 92, § 11–2–103(8) at 507. Counsel argued that the Board had failed to provide notice to the remaining stockholders and secured creditors.

In response, the Board declared a recess in the proceedings, allowing for the state attorney general representing the Board to research the Bank's objections, and then engaged in informal discussions with counsel and bank representatives. These proceedings were recorded and transcribed.

The Board chair commenced by inquiring about information regarding the condition of First Bank and any plans for recapitalization or otherwise meeting the capital call which had expired the prior day.

A colloquy then took place among the chairman and other members of the Board, the Bank's counsel, and one of the directors present. The topics included ranged from the status of loans and the capital to the prospects for sale. The questionable status of certain significant outstanding loans had not improved. The Bank continued to insist, as it had in past discussions, that it was able to continue operating day-to-day and no emergency existed, but the Board made clear it was unpersuaded.

The Bank presented a letter of intent to purchase which had been faxed the day before from an out-of-state banker. It indicated the purchase was contingent on, among other things, the purchaser obtaining 100% financing and pursuing "due diligence." The Board expressed its concern with the contingent nature of the commitment. The Board was also concerned that First Bank's capital had continued to deteriorate, that a holder of 44% of First Bank's stock was insolvent and therefore had no ability to pay the capital assessment necessary to comply with the Board's August order, and that only a few small shareholders had paid their assessments.

At the end of the discussion, the board determined that it would not conduct a formal hearing pursuant to § 11–2–103(8) because of concerns there had not been compliance in all respects with the requirements for notice. Prior to adjourning, the chairman stated in pertinent part:

[B]efore closing I would like, for the record, to deliberate on what [the Bank's

attorney] has brought out and determine if in fact an emergency condition does exist. I think there is ample evidence to suggest that is a distinct possibility, and I would just ask the Board if it would be their pleasure, if we could go into Executive Session for deliberations on the issue, whether extraordinary circumstances and an emergency may exist, and for us to give deliberations to that yet today while we are all here.

The Board then convened in the executive session, which was also recorded and transcribed. All members quickly agreed that First Bank's capital status had continued to deteriorate, that there were a substantial number of unsecured deposits in First Bank resulting in a significant risk to the depositors, in addition to a substantial impact to the F.D.I.C. by the continued erosion through operating losses not related to specific loans. The Board also found that the likelihood that First Bank would obtain the necessary capital to continue operating and meeting the demands of its depositors was extremely unlikely. The Board concluded that extraordinary circumstances existed requiring immediate action.

On the same day, Friday, acting pursuant to Colo.Sess. Laws 1989, ch. 93, § 11–5–105(3) at 540, the state bank commissioner took possession of First Bank and appointed the F.D.I.C. as liquidator. The F.D.I.C. executed a purchase and assumption agreement with another bank, which opened for business on Monday.

Within ten days the Bank applied to the Board seeking rescission of the Board's order. Three days of hearings were held on this request on October 31, 1989, November 30, 1989, and January 23, 1990. The Board denied the Bank's request to rescind. That denial was appealed to the district court, which affirmed the Board's action. The Bank has appealed that ruling to us.

I.

The Bank's first contention is that the Board exceeded its statutory authority by failing to provide proper notice and a hearing prior to seizing and liquidating First Bank. We disagree.

The Board's actions were taken prior to the 1990 amendments to §§ 11–2–103(8) and 11–5–102(3)(b). *See* Colo.Sess. Laws 1990, ch. 79, § 11–2–103(8) at 652 and Colo. Sess. Laws 1990, ch. 79, § 11–5–102(3)(b) at 663. Section 11–2–103(8) as then in effect provided in relevant part:

> With respect to any ... proceeding to discuss or approve voluntary or involuntary liquidation actions under article 5 of this title, ten days' notice by certified mail, return receipt requested, and hearing shall be provided to the bank and any person affected in advance of any action taken by the banking board. *In cases found by the banking board to involve extraordinary circumstances requiring immediate action, the banking board may take such action without notice or hearing, but shall promptly afford a subsequent hearing upon application to rescind the action taken.* (emphasis added)

The Bank contends that the reference to "take such action without notice or hearing" refers to holding "proceedings to discuss or approve" liquidation, but not the actual liquidation. The Bank argues that ten days notice was therefore still required prior to the sale of First Bank's assets, and as a result, the Board exceeded its powers when it actually liquidated First Bank prior to a hearing. We disagree.

■ Our primary goal in determining the meaning of a statute is to ascertain and give effect to the intent of the General Assembly. And, whenever possible we must make this determination from the plain language, construing the statutory scheme as a whole and giving effect to all its parts. *Danielson v. Castle Meadows, Inc.*, 791 P.2d 1106 (Colo.1990).

Colo.Sess. Laws 1989, ch. 93, § 11–5–102(3)(b) at 539, enacted prior to § 11–2–103(8), already permitted the Board to "determine to liquidate" without notice, even without the existence of extraordinary circumstances, but required ten days notice prior to the actual liquidation. Hence, the Bank's construction of § 11–2–103(8) to

limit the action which can be taken in "extraordinary circumstances" to discussion and approval of, but not actual, liquidation would not give effect to all parts of the statutory scheme then in effect.

■ We conclude that § 11–2–103(8), reasonably construed in the context of the other statutory provisions, permitted the Board, in extraordinary circumstances requiring immediate action, to seize and liquidate a bank's assets without notice or hearing, provided that, upon application for rescission within ten days of such action, it conducted a prompt hearing on the request for rescission.

Here, the Bank filed its application within ten days. No claim has been made that the Board failed to provide a prompt hearing. The Board therefore did not violate the applicable statutes by going forward with the liquidation of the assets of First Bank and then providing the requested hearing.

## II.

### A.

■ The Bank argues, in the alternative, that even if such a procedure is permitted by statute, the Board failed to make the finding that "extraordinary circumstances requiring immediate action" existed. We disagree.

During the executive session, the Board chair summarized the evidence submitted during the discussion with the Bank and derived from the prior examinations of the Bank. He concluded: "All of the foregoing culminate into extraordinary circumstances which, in my opinion, mandate immediate action." Another board member then made a motion that "extraordinary circumstances requiring immediate action exist and that, in the opinion of the Board, an emergency exists which may result in serious losses to the depositors...." The Board unanimously agreed.

Under these circumstances the findings were sufficient and appropriate. *See Monroe Industrial Bank v. Bloom*, 648 P.2d 686 (Colo.App.1982); *Walton v. Banking Board*, 36 Colo.App. 311, 541 P.2d 1254 (1975).

### B.

■ The Bank next argues that the evidence was insufficient to constitute "extraordinary circumstances." We again disagree.

■ Our review in this context is limited to a determination of whether the Board's order is supported by substantial evidence in the record. Section 11–2–105, C.R.S. (1987 Repl.Vol. 4B); *see Allen Co. v. Industrial Commission*, 762 P.2d 677 (Colo. 1988); *Monroe Industrial Bank v. Bloom, supra.*

Examinations of First Bank over a period of approximately five months revealed a continuing deterioration of its financial status. The initial report revealed a negative capital assessment which continued to worsen over time.

The United States Supreme Court has recognized a bank failure can constitute an extraordinary situation. *Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); *see also F.D.I.C. v. American Bank*, 629 F.2d 951, 954 (4th Cir.1980) ("When a bank becomes unable to meet its obligations, prompt action is a compelling necessity for the maintenance of public confidence, for the preservation of the institution's value as a going concern and for the prevention of runs on the bank.").

First Bank also failed to comply with the Board's order to levy an assessment and one of the major shareholders was insolvent, making payment of the assessment impossible. Finally, the Board found that First Bank was unable to demonstrate with any significant reliability the ability to secure an investor, or otherwise inject the necessary capital, in the immediate future.

The record therefore supports the Board's finding of extraordinary circumstances.

### III.

■ The Bank next contends that, at the subsequent hearings, there was no oppor-

tunity for it to have its property restored and thus there was never a "meaningful" hearing. It argues that as a result the Board violated its due process rights under the Fifth Amendment. Once again, we disagree.

The argument rests in part on the assumption already rejected that § 11–2–103(8) should be construed to provide for a hearing on a request for rescission only before liquidation. Having construed the statute to permit the hearing and the claim for rescission after liquidation, we must therefore determine whether the procedures afforded the Bank in the circumstances of this case nevertheless violated the Bank's right to due process.

We note at the outset that the Bank could hardly claim surprise at the action taken by the Board or a lack of opportunity to present information to the Board. The issue of inadequate capital was first raised in the examination in April of 1989. This was followed by a series of examinations and communications about their results, the actions First Bank needed to take to continue its operations, and its attempts to satisfy those requirements. The Bank had been on actual notice since the Board's letter of September 11 that it was contemplating liquidation.

During the informal discussions with the Board preceding the decision to liquidate, the Board expressed its concern with the contingent nature of the purchase commitment, the continued deterioration in capital, and the Bank's inability to pay the capital assessment previously ordered. Finally, before adjournment, the chair stated that the discussions would continue in executive session to determine if in fact extraordinary circumstances existed.

The record thus establishes that the Bank was not precluded from meaningful participation during the course of the administrative decision-making process. *See Woods v. Federal Home Loan Bank Board*, 826 F.2d 1400, 1412 (5th Cir.1987), *cert. denied*, 485 U.S. 959, 108 S.Ct. 1221, 99 L.Ed.2d 422 (1988) ("To the extent that due process requires a meaningful opportunity to be heard and meaningful notice in this case, plaintiffs received just that throughout the four-year period of continuous, open supervision by Bank Board examiners."). The success of the Bank's argument therefore turns on whether the hearing provided on the request for rescission after liquidation, together with these earlier procedures, satisfy the requirements of due process.

■■■ Due process requires at a minimum that there be notice and an opportunity to be heard at a meaningful time and in a meaningful manner. This insures fairness and protection from an arbitrary or mistaken deprivation of property. *Fuentes v. Shevin, supra*. We recognize that a post-deprivation hearing, even with an adequate remedy, does not always satisfy the requirements of due process, and we agree with the general proposition that a wrong may not be done even if it can be undone. *See Fuentes v. Shevin, supra*.

■■■ The timing and formalities of due process protections are nevertheless flexible. A determination of what protections are demanded in a particular situation rests on the balancing of three distinct factors:

First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interests through the procedures used, and the probable value, if any, of additional or substitute, procedural safeguards; and finally, the government's interest, including the function involved and the physical and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18, 33 (1976).

The private interest affected here is obvious. However, the F.D.I.C. had an interest in arranging an orderly liquidation at the best price possible in order to reduce its possible losses as insurer. Thus, the procedure mitigates any possible financial losses to those holding interests in the assets being liquidated. *See Telegraph Savings & Loan Ass'n v. Schilling*, 807 F.2d 590

(7th Cir.1986), *cert. denied,* 484 U.S. 818, 108 S.Ct. 73, 98 L.Ed.2d 37 (1987).

The risk of an erroneous deprivation under the applicable statutory scheme is not significant. The actions are taken not at the behest of a private citizen, but by an impartial government board responsible for determining, under the standards of a narrowly drawn statute, that it was necessary and justified in the particular instance. *See Fuentes v. Shevin, supra.*

Moreover, the Board had been monitoring First Bank's financial status for approximately five months through three extensive examinations. Each report set forth specific problems and conditions with which First Bank was ordered to comply. Prior to the execution of each report the examiners had discussed any contested figures with First Bank officials. On October 6, the Board questioned counsel and the directors of First Bank present about these specifics, whether the conditions had been met, and whether First Bank's status had changed. In these circumstances, the possibility of an erroneous deprivation was insignificant.

In contrast, a bank failure presents an extraordinary situation with the potential of great harm to depositors and the public that justifies postponing notice and an opportunity for a hearing. *See Fuentes v. Shevin, supra.* "[P]rotracted, public hearings on a bank's financial condition would prompt a loss of depositor confidence and the resultant run on withdrawals, loss of a bank's business good will and general adverse effect on the economic soundness of the surrounding community." *Farmers State Bank, Kanawha v. Bernau,* 433 N.W.2d 734, 739 (Iowa 1988).

These concerns require that liquidation, not just seizure, proceed without delay:

A purchase and assumption transaction will not work unless it is completed before the depositors know that their [bank] is insolvent and in receivership. For once they find out, they will begin withdrawing their deposits, and there will be little or nothing for the assuming association ... to assume.... Blocking withdrawals will anger the depositors, making it difficult to induce them to transfer their loyalties to the assuming institution; so [the receiver] will lose the going-concern premium to which it looks to reduce its losses on the transaction. Deposit insurance will not necessarily prevent a 'run,' since it takes time to collect the insurance [proceeds] and since some depositors have deposits in excess of the insurance limit.

*Telegraph Savings & Loan Ass'n v. Schilling,* 807 F.2d at 591–92.

As a result, "a purchase and assumption must be consummated with great speed, usually overnight, in order to preserve the going concern value of the failed bank and avoid an interruption in banking services." *Gunter v. Hutcheson,* 674 F.2d 862, 865 (11th Cir.1982), *cert. denied,* 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982); *see Fahey v. Mallonee,* 332 U.S. 245, 67 S.Ct. 1552, 91 L.Ed. 2030 (1947); *F.D.I.C. v. Merchants National Bank,* 725 F.2d 634 (11th Cir.1984), *cert. denied,* 469 U.S. 829, 105 S.Ct. 114, 83 L.Ed.2d 57 (1984); *F.D.I.C. v. American Bank, supra.*

The United States Supreme Court, in *Fahey v. Mallonee, supra,* 332 U.S. at 253–54, 67 S.Ct. at 1556, 91 L.Ed. at 2039, long ago recognized the property interests at stake, but found the governmental interests paramount in upholding the seizure of bank assets without a hearing:

This is a drastic procedure. But the delicate nature of the institution and the impossibility of preserving credit during an investigation has made it an almost invariable custom to apply supervisory authority in this summary manner. It is a heavy responsibility to be exercised with disinterestedness and restraint, but in the light of the history and customs of banking we cannot say it is unconstitutional.

Here, the record substantiates the Board's conclusion, in its order denying rescission, that the post-deprivation hearing did not reveal any significant information the Board had not already known through the investigations and October 6 discussion.

We conclude that the procedures utilized by the Board in this particular situation satisfy the requirements of due process.

## IV.

### A.

█ The Bank also argues that the post-deprivation hearing actually provided was not meaningful because the Board which conducted the hearing was "comprised of members which [sic] had an adverse interest to the bank." We disagree.

Pursuant to § 11–2–102(5), C.R.S. (1992 Cum.Supp.), a banking board member is disqualified from participating in consideration of the issues presented if that member is or has been a "director, officer, partner, employee, member, or stockholder" of a party involved in the proceeding. There is no claim that any member of the Board was disqualified under this provision.

█ There is a presumption of integrity, honesty, and impartiality in favor of those serving in quasi-judicial capacities. An adjudicatory hearing will be held to have been conducted impartially in the absence of a personal, financial, or official stake in the decision evidencing a conflict of interest on the part of a decision-maker. *Mountain States Telephone & Telegraph v. Public Utilities Commission*, 763 P.2d 1020 (Colo.1988); *Scott v. City of Englewood*, 672 P.2d 225 (Colo.App.1983).

Here, the record supports the findings of the Board that none of the members challenged by the Bank had any direct personal, financial, or official stake in the decision to seize and liquidate the assets of First Bank, and there was no other conflict of interest sufficient to overcome the presumption of fairness. *See Scott v. City of Englewood, supra.*

### B.

█ The Bank contends that it was also deprived of a meaningful hearing when the Board convened in the executive session in the presence of the Bank Commissioner and his deputy, but without the presence of the Bank or its counsel. It argues that the presence of the Commissioner and his deputy, the same officials who had allegedly initiated the action, precluded an impartial determination by the Board and, thus, violated the Bank's due process. We disagree.

Unlike the executive session involved in *deKoevend v. Board of Education*, 688 P.2d 219 (Colo.1984), here the minutes of the Board's executive session were in the form of a verbatim transcript of the meeting. Neither the Commissioner nor his deputy spoke at any time. The Bank presented no evidence of any resulting prejudice. Thus, while the presence of the Commissioner and his deputy might have created an appearance of impropriety, the Bank has failed to overcome the presumption of regularity and fairness in the Board's executive session. *See Weissman v. Board of Education*, 190 Colo. 414, 547 P.2d 1267 (1976).

## V.

█ Finally, the Bank contends the Board considered *ex parte* letters of criminal referral by bank regulators. It argues that, because it was not given a chance to respond to the accusations made in the letters, it was deprived of a meaningful hearing when the Board convened in executive session and considered the letter. We are not persuaded.

█ Although administrative proceedings need not be conducted according to strict rules of procedure and evidence, the hearing process must be conducted in an atmosphere evidencing principles of actual and apparent fundamental fairness in the adjudication of matters before the Board. *deKoevend v. Board of Education, supra; Sclavenitis v. Cherry Hills Board of Adjustment*, 751 P.2d 661 (Colo.App.1988).

In the Board's order denying a motion to compel regarding the letters of criminal referral it explicitly stated that its review would be conducted without consideration of the letters. In light of this and the abundance of other evidence in the record prior to the liquidation and produced in the

three days of hearings after the liquidation, we conclude the existence of the letters did not result in a violation of due process.

## VI.

We decline to address the Bank's arguments that the Board's actions during the executive session violated the open meetings law, the administrative procedure act, and the code of ethics because these arguments were raised for the first time in the Bank's reply brief. *See People v. Czemerynski,* 786 P.2d 1100 (Colo.1990).

The judgment is affirmed.

RULAND and ROTHENBERG, JJ., concur.