QUESTIONS PRESENTED AND CONCLUSIONS
ISSUE ONE: Does the Agreement, or any part of it, violate any of the provisions of the Act which imposes restrictions on the payment of postemployment compensation to public employees?
ANSWER: No. The Act prohibits the payment of postemployment compensation except in limited circumstances. The Act expressly contemplates settlement of bona fide employment disputes for money, and reimbursement of additional expenses arising from the employment relationship, so long as any settlement is disclosed. Moreover, a settlement does not provide "compensation . . . after termination of . . . employment with a . . . government-financed entity." The definition of postemployment compensation does not include settlement payments. In addition, the provisions of the Act do not apply to payments made to tenured faculty members to relinquish their tenured positions.
ISSUE TWO: How could a lawsuit be structured to challenge the settlement agreement? Who would be a proper plaintiff in such a suit?
ANSWER: Because we perceive no violation of the Act in this case, there is no need to determine how a suit should be brought. Nevertheless, and in general, a taxpayer would likely have standing to challenge a violation of the Act. Taxpayer standing in Colorado is relatively expansive. The General Assembly arguably has standing, although that is a much closer question, and it appears that a court would likely hold that the General Assembly does not have standing. The General Assembly has standing when it suffers an injury peculiar to it as a legislative body. The Controller and the Treasurer may have standing. In any event, the General Assembly should consider more carefully defining the remedy for a violation of the Act and what entity or persons should be authorized to enforce the Act.
ISSUE THREE: If the Agreement does not violate the Act, and the General Assembly wishes to prohibit future agreements of the type entered into by the University and Dr. Albino, which provisions of the Act need to be amended?
ANSWER: If the General Assembly wishes to bring settlement agreements within the Act's prohibition against postemployment compensation, settlement payments need to be added to the definition of postemployment compensation. Additionally, § 24-19-105 would need to be clarified since it implies that settlement payments are not prohibited postemployment compensation so long as they are disclosed. One helpful amendment may be to have the legitimacy of any settlement determined by the State Claims Board.
BACKGROUND
Dr. Albino's Appointment and Contract Extension
Dr. Albino was hired to serve as the seventeenth President of the University of Colorado. The initial term of her appointment was from June 1, 1991 to May 31, 1994. Accordingly, a written contract was signed by Dr. Albino and the Regents on August 30, 1991. While this contract set out the basic terms of employment, it did not discuss or provide for any severance pay upon early termination.
In September, 1993, after a favorable "administrative" review, the Regents voted to extend the initial term of Dr. Albino's appointment to August 31, 1996. On January 14, 1994, a new contract was entered into between Dr. Albino and the Regents memorializing the extension. This contract was almost identical to the original contract. Again, the contract made no mention of compensation upon early termination of the contract.
The Agreement
On August 17, 1995, Dr. Albino and the Regents entered into the Agreement whereby Dr. Albino would announce her resignation as President and be assigned to a position as a full-time tenured Professor in the Department of Psychiatry. Dr. Albino assumed a tenured faculty position when she came to the University in 1989, and never relinquished that status, even after she was appointed President. Dr. Albino's resignation as President was to be announced by October 15, 1995.
The Agreement sets out the terms of Dr. Albino's resignation from the office of President. It states that the University and Dr. Albino "intend by this Agreement to resolve all matters related to Dr. Albino's service as the President of the University and to avoid completely disruptions or expenses that might otherwise be associated with claims, disputes or uncertainties, if any, arising out of matters relating to that service." Agreement at 1.
The Agreement provides Albino with monetary amounts in three separate provisions:
Paragraph 8, 9 Payments
Paragraphs 8 and 9 of the Agreement provide that Dr. Albino shall receive an annual salary as long as she holds a position as a tenured full-time faculty member. Between September 1, 1996, and August 31, 1997, this salary shall be the average of the annual salaries paid by the University to those full professors in the Department of Psychiatry who comprise the 25% most highly compensated faculty members in the Department of Psychiatry. After September 1, 1997, Dr. Albino will receive salary adjustments in accordance with the laws of the Regents and University policy.
Paragraph 10 Payments
Under Paragraph 10 of the Agreement, the University agrees to pay Dr. Albino as "Additional Salary, certain funds which are intended to compensate her for, among other things, uncompensated costs and expenses relating to her service in and resignation from the office of President, for costs of transition to her new position, and in consideration of the terms of th[e] Agreement." This last part, referring to "in consideration of th[e] Agreement," encompasses the mutual release of claims detailed later in the Agreement. The Paragraph 10 "Additional Salary" is in the amount of $25,000 per month, and is to be paid Dr. Albino as long as she holds a position as President or full-time tenured faculty member at the University, for the months of August, September, October, November, and December 1995. Dr. Albino remained as President until November 15, 1995, and can begin her faculty position in early 1996 after her exercise of accrued vacation leave. Dr. Albino must remain employed with the University to obtain these funds. If she remains employed through December 1995, this component of the Agreement would yield her an additional $125,000.
Paragraph 11 Payments
Under paragraph 11, the University agrees it will pay Dr. Albino $175,000 if she voluntarily resigns her tenured position and ceases her employment with the University before August 31, 1997. If Dr. Albino voluntarily resigns her tenured position between September 1, 1997 and March 1, 1998, the University will pay her $100,000. The Agreement also provides for reimbursement of moving expenses.
The Public Character of the Agreement
The Agreement does not contain a confidentiality clause. Our review has disclosed that the parties were aware of the fact that the Act requires that the Agreement be treated as a public record. The Agreement has been treated as a public record in compliance with the Act. § 24-19-107.
The Bona Fides of the Settlement
The Attorney General's Office conducted a limited factual inquiry to ascertain, among other things, whether the Agreement involved the settlement of a bona fide employment dispute as contemplated by C.R.S. § 24-19-105.[1] In conducting our inquiry, we interviewed a number of persons including representatives of the Regents, the Regents' legal counsel, and Dr. Albino with her counsel present. We also solicited their views on the questions posed by Representative Faatz.
The parties to the Agreement stated that they were very aware of the Act at the time of drafting the Agreement, but believed they complied with it because, among other things, the Agreement settled a legitimate employment dispute between Dr. Albino and the University. There appears to have been a bona fide employment dispute to settle.
First, it was clear that the parties were in an adversary posture prior to entering into the Agreement and that there was a legitimate possibility for litigation. By letter dated June 13, 1995, the Regents informed Dr. Albino that it had retained outside counsel to "advise it on issues involving the terms and conditions of your employment contract and related matters." The letter from the Regents also suggested that Dr. Albino should retain her own counsel. It appears that Dr. Albino had consulted with an attorney by this time.
Second, the statute authorizing appointment of the president of the University expressly provides that the president "shall hold [her] office until removed by the board forcause . . . ." C.R.S. § 23-20-106 (emphasis added). While the Act provides that Dr. Albino is an "at-will" employee who serves at the pleasure of the University, §24-19-104(1)(a), the "for-cause" language is a term of art in employment law which would indicate that Dr. Albino could be discharged only for cause. See Allabashiv. Lincoln National Sales Corp. of Colorado-Wyoming,824 P.2d 1 (Colo.App. 1991). There is a conflict in interpreting the two statutes, the resolution of which cannot be predicted with certainty at this time.[2]
Third, there are instances where the Regents did not follow its own procedures in evaluating Dr. Albino. For example, the Regents appears to have acted contrary to its own procedures in accelerating Dr. Albino's final evaluation.
Fourth, Dr. Albino may have been treated differently than other former presidents of the University. For example, Dr. Albino's husband was forced to resign his position with the University, although there is evidence that spouses of past presidents were permitted to retain employment with the University.
There are other potential claims as well that will not be detailed here. We do not offer an opinion that any of Dr. Albino's claims would have succeeded; however, it is our opinion that at least some of Dr. Albino's potential claims are non-frivolous, could well have survived a motion to dismiss, and the settlement of those claims appears to be bona fide.
ANALYSIS OF ISSUE ONE
Purpose and Scope of the Postemployment Compensation Statute
The Act was enacted in order to reduce government costs and preserve the public's trust in government by limiting government's ability to pay compensation to employees after they have discontinued their service. C.R.S. § 24-19-101. The Act's main feature is that it prevents a government employer from paying more than three-months salary and benefits to an employee after the employee leaves the government's employ.
The Act contains the following major elements. It defines which employees and governmental entities are covered and further defines what constitutes postemployment compensation. §24-19-102. It expressly prohibits the payment of postemployment compensation but permits the payment of three additional months of salary and benefits under some circumstances. § 24-19-103. The Act requires that applicable employment contracts contain language designed to insure compliance with the Act. § 24-19-104. It contains a specific provision for settlement agreements relating to "employment disputes," and requires that such agreements be matters of public record. § 24-19-105. The Act specifically exempts from its coverage tenured faculty members and civil and classified service employees. §24-19-108.
The Act's definition of "governmental unit" includes any institution of higher education. § 24-19-102(3)(a). The Act applies to Dr. Albino as the President of the University because she is an employee of an institution of higher education.
Postemployment Compensation and Settlement Agreements
Postemployment compensation is defined by the Act at §24-19-102(5)(a) as:
 Compensation paid to a government-supported . . . employee after termination of . . . employment with a governmental unit . . . if such compensation was not earned prior to such termination. "Postemployment Compensation" shall include but is not limited to, the provision of any unearned postemployment employee benefits. . . .
C.R.S. § 24-19-105 discusses settlement agreements. It states:
 (1) Notwithstanding any other law to the contrary, if any settlement agreement between a governmental unit or government-financed entity and a government-supported official or employee settles any employment dispute between such parties and involves the payment of any compensation to such official or employee after the term of employment of such official or employee has ended, information regarding any amounts paid or benefits provided under such settlement agreement shall be a matter of public record. Any governmental unit or government-financed entity that is a party to such a settlement agreement shall make such information available for public inspection and copying during regular business hours.
 (2) The provisions of subsection (1) of this section shall apply to:
 (a) Any settlement agreement entered into on or after July 1, 1993; and
 (b) Any settlement agreement entered into prior to July 1, 1993, if no other provision of law would prohibit public disclosure of the provisions of such settlement agreement. (Emphasis added.)
Settlement payments made pursuant to settlement agreements are not included in the definition of postemployment compensation. Instead, the Act suggests that "compensation" may be paid under a settlement agreement so long as the agreement is disclosed to the public.
The determination of the meaning of a statute is made by construing the statutory scheme as a whole and giving effect to all of its parts. First Bank v. Dept. of RegulatoryAgencies, 852 P.2d 1345, 1349 (Colo.App. 1993); see alsoR.E.N v. City of Colorado Springs, 823 P.2d 1359, 1364
(Colo. 1989)("courts look first and foremost to the language of the statute itself to discern legislative intent"). When interpreting two statutory sections, the courts will attempt to harmonize them in order to give effect to their purposes.Ragsdale Bros. Roofing, Inc. v. United Bank, 744 P.2d 750,753 (Colo.App. 1987); Martinez v. Badis, 842 P.2d 245
(Colo. 1992)("it is presumed that the General Assembly intended that the entire statute be effective").
The Act must be read so as to give effect to all of its terms. In this case, in order to harmonize § 24-19-102(5)(a) with § 24-19-105, it is more likely than not that the courts would treat settlement payments made pursuant to settlements of employment disputes differently from postemployment compensation.
The Agreement appears to constitute a "settlement agreement" under § 24-19-105. As noted above, Dr. Albino appears to have had non-frivolous potential and asserted employment-related claims. And, the Agreement was negotiated to include a comprehensive release of any and all claims that Dr. Albino might have against the University, its officers, employees, agents and representatives.
It is our opinion that § 24-19-105 would be construed so as not to forbid government entities to settle employment-related disputes by agreement in appropriate circumstances.Colorado State Board of Medical Examiners v.Saddoris, 825 P.2d 39, 42 (Colo. 1992) ("it is a basic rule that a statute should be construed as a whole so as to give consistent, harmonious, and sensible effect to all its parts").[3]
Tenure Exemption and the Paragraphs 8, 9, and 11 Payments
The Act specifically exempts "[a]ny tenured or tenure track faculty member whose primary job assignment is teaching, research, or both teaching and research and who is employed at a state institution of higher education . . . ." C.R.S. §24-19-108(b).
Under the terms of the Agreement, and upon the effective date of her resignation from the office of President, Dr. Albino assumes teaching and research responsibilities as a full-time tenured faculty member. Prior to assuming the Presidency, Dr. Albino held a tenured faculty position with the University. She retained that position during her tenure as President. The Agreement makes it clear that Dr. Albino's tenured position is subject to standard University policies and procedures. Agreement at 8, 9.
This part of the Agreement does not appear to have been drafted to "to evade the requirements" of the Act. C.R.S. §24-19-104(3). Among other things, Dr. Albino was a tenured faculty member prior to her appointment as President, retained the position during her presidency, and she returns to the same status after resigning her position as President.
Thus, Paragraphs 8, 9, and 11 of the Agreement are exempt from the provisions of the Act. These paragraphs provide for Dr. Albino's salary and adjustment thereto as a full-time tenured faculty member. Paragraph 11, which provides for lump sum payments upon her resignation from her tenured faculty position, is also not subject to the terms of the Act because it relates to the surrender of her tenure rights, an occurrence clearly contemplated under C.R.S. § 24-19-108.
Postemployment Compensation and Expense Reimbursement
Paragraph 10 of the Agreement with Dr. Albino provides that the additional $25,000 per month is a reimbursement of costs and expenses "to compensate her" for certain "uncompensated costs and expenses relating to her service in and resignation from the office of President, for costs of transition to her new position, and in consideration of the terms of this Agreement" which include the parties' mutual releases. Based upon our limited factual review, it also appears that Dr. Albino incurred additional "uncompensated costs," particularly attorney's fees and relocation expenses. To the extent to which the paragraph 10 payments compensate Dr. Albino for such costs, they appear to be outside of the scope of the Act, because the definition of postemployment compensation does not include a reimbursement of expenses.
Postemployment Compensation and the Termination Requirement
There is another reason why the paragraph 10 payments do not appear to be postemployment compensation. Under § 24-19-102
(5)(a) postemployment compensation is compensation paid, among other things, "after termination . . . of employment with a governmental unit." Under the Agreement, Dr. Albino receives the additional $25,000 per month compensation only if she remains employed with the University. Payments made to Dr. Albino while she remains employed with the University thus appear to be outside of the scope of the Act.
ANALYSIS OF ISSUE TWO
As an initial matter, we do not believe that the Act was violated in this case, therefore, there is no need to determine how to fashion a lawsuit. Nevertheless, we will attempt to offer our views generally about the manner in which the Act could be enforced.
The Act does not specify what would happen if it is violated, nor does it identify which persons would have standing to bring a lawsuit in the event a violation is discovered.[4] Thus, there presently exists some confusion over how the Act is to be enforced.
It appears to us that any Colorado taxpayer likely would have standing to bring an action if the Act were violated. Taxpayer standing in Colorado is relatively expansive.Dodge v. Department of Social Services, 198 Colo. 379,600 P.2d 70 (1979). Essentially, under Dodge, a taxpayer can bring a lawsuit to challenge a governmental action if: (a) the action injures him or her as a taxpayer and (b) the statute or constitutional provision that is allegedly violated protects the taxpayer in his or her status as a taxpayer. A violation of the Act would likely satisfy this test.
The General Assembly arguably has standing to challenge a violation of the Act, although that is a much closer question. So long as the General Assembly can establish that it has suffered an injury to an interest peculiar to the General Assembly, it has standing to challenge that action in court.Colorado General Assembly v. Lamm, 704 P.2d 1371, 1377
(Colo. 1985) (Lamm II); Colorado General Assembly v.Lamm, 700 P.2d 508, 516 (Colo. 1985) (Lamm I). It can be argued that a violation of the Act may constitute an injury to the General Assembly's express limitation on the expenditure of funds appropriated by it to public entities. However, a court may well hold that the Act is no different than other appropriations limitations and may deny standing on that basis.[5] Of course, individual members of the General Assembly could sue as taxpayers.
It is also arguable that the Treasurer may have some authority to enforce the Act. Colo. Const. art. X, § 12(1).See People v. Higgins, 69 Colo. 79,168 P. 740 (1917).
The General Assembly may wish to define more precisely what party or governmental entity should be responsible for enforcing the Act. The General Assembly may also wish to define the precise remedy for the Act's violation, such as making agreements in derogation of the Act void and making illegal postemployment compensation recoverable by the enforcing entity. If the General Assembly addresses these concerns, it should determine if these remedies are to be exclusive.
ANALYSIS OF ISSUE THREE
If the General Assembly wishes to prohibit future agreements of the type entered into by the University and Dr. Albino, the Act would need to be amended.
First, the definition of postemployment compensation found at § 24-19-102(5)(a) would need to be amended to include, expressly, settlement payments. For purposes of clarity, that section should expressly cross-reference § 24-19-105. The definition of settlement agreement should include settlement of all bona fide statutory, tort, property, contract and other potential claims.
Second, § 24-19-105 also would need to be amended. As presently worded § 24-19-105 appears to provide that payments made in conjunction with settlement agreements are not postemployment compensation.
There are, however, a number of good policy reasons for continuing to allow government agencies to settle employment disputes. First, a prohibition on all settlement agreements suggests that a lawsuit must be filed before a governmental entity could ever settle a claim. If that is true, then a governmental entity should be permitted to settle a case before suit is filed if it can avoid significant expense by doing so. Second, lawsuits can be very disruptive in addition to being expensive. Also, once a suit is filed, positions can galvanize, and it may become more difficult to reach a negotiated resolution. So long as a settlement agreement is genuine and resolves bona fide employment disputes, public entities should retain the flexibility to settle those disputes without being forced to resort to litigation.
The General Assembly should consider a mechanism for distinguishing between sham settlements and legitimate, bona fide settlements. One such mechanism would be to submit proposed settlement agreements to the State Claims Board. See
C.R.S. §§ 24-30-1508, 1509.[6] The Board could evaluate the claims to be settled in executive session and determine whether they are bona fide and reasonable in amount given the nature of the claims. The Board could require a statement in compliance with state law that an agreement submitted to the Board involves the good faith settlement of potential litigation, or the Board could be required to make such a finding. The Act also could require that any settlement agreement submitted to the Board contain a complete release of all claims of any type against the State. Settlement agreements not properly submitted to the Claims Board could be subject to the Act's prohibitions and could also be declared void by the Act.
CONCLUSION
We conclude that the Agreement does not violate the Act. Taxpayers would have standing to challenge a violation of the Act; other entities or persons may have standing. The General Assembly should consider adding specific remedies for the Act's violation. There are also a number of clarifications to the Act that the General Assembly should consider.
 GALE A. NORTON Attorney General
 RICHARD A. WESTFALL Special Deputy Solicitor General
[1] The reason for this inquiry is that the request from Representative Faatz asks for our opinion of whether the Agreement complies with the Act, and the Act expressly forbids public entities from entering into contracts that contain provisions that are "intended to evade the requirements of this article." C.R.S. § 24-19-104(4)(a). We thus undertook to make some determination of whether the Agreement constituted a bona fide settlement to determine if the Agreement was written so as to "evade the requirements" of the Act. Even if the Agreement were a bona fide settlement agreement, that does not necessarily mean that the Agreement complies with the Act. The issue of whether bona fide settlement agreements are exempt from the Act's limitations on post-employment compensation will be addressed below.
[2] This case, if litigated, would involve the application of conflicting doctrines of statutory construction. As a general rule, a special or a specific statutory provision prevails over a general provision unless the general provision is later in timeand the General Assembly manifests a clear intent that the general provision should prevail over the specific.Climax Molybdenum Co. v. Walter, 812 P.2d 1168,1174 (Colo. 1991); C.R.S. § 2-4-205. We offer no opinion on whether the specific "for cause" statute or the later, more general Act would prevail in this case.
[3] C.R.S. § 24-19-104(1)(b), which addresses mandatory contractual language, does not change our analysis. Its reference to "buy-outs" and "liquidated damages" do not appear to refer to bona fide settlements of employment disputes but rather to prearranged, stipulated contract issues which are the focus of the Act.
[4] Standing is a legal concept that requires that a person who brings a lawsuit have some concrete stake in the outcome of the suit. To establish a concrete stake in the outcome, a person bringing a suit is usually required to show that he or she has been injured in some way by the action he or she is challenging in the lawsuit. Wimberly v. Ettenberg, 194 Colo. 163,570 P.2d 535 (1977).
[5] C.R.S. § 24-30-202(2) gives the Controller the power to enforce limitations on appropriations. Seealso C.R.S. § 24-30-202(3) (making commitments made in contravention of law "null and void ab initio"). These statutes suggest that an action by the Controller would be the appropriate vehicle for addressing an illegal payment.
[6] The University of Colorado is expressly excluded from the Risk Management Act, C.R.S. § 24-30-1517 (2), so the Claims Board's authority would have to be appropriately clarified. Review by the Claims Board likely would be limited to those settlements involving state agencies. The Act reaches other governmental entities, such as local governments, and the General Assembly should consider this fact in amending the Act.